**Sarah HARMAN, et al., Plaintiffs,**

v.

**LYPHOMED, INC., et al., Defendants.**

**No. 88 C 0476.**

United States District Court, N.D. Illinois, E.D.

March 6, 1992.

Robert D. Allison, Chicago, Ill., Jules Brody, Mark Levine, Stull, Stull & Brody, New York City, Michael W. Coffield, Phillip M. Goldberg, Theodore E. Harman, Coffield Ungaretti & Harris, Chicago, Ill., for plaintiffs.

William R. Carney, John B. Bitner, Larry L. Thompson, John W. Rotunno, Bell, Boyd & Lloyd, George J. Casson, Jr., Charles W. Murdock, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This securities fraud class action settled in 1988 and 1989. The settlement was $9,900,000. The settlement fund has been held in an escrow account and also includes interest that has been accumulating since December 1989. The settlement, which was approved by the court, provides that the attorneys for the class could request attorneys fees to be paid from the fund, but that the amount requested, not including expenses, could not exceed 30% of the $9,900,000 settlement.

Counsel timely moved for attorneys fees, requesting a lodestar of $1,489,526 which, combined with a multiplier of 2.012, results in an award equal to 30% of the settlement fund. Counsel also suggested that a percentage of the fund or a blended percentage of the fund/lodestar method could be used to produce a 30% award. The lodestar method was used. Based on a sampling of the fees requested, it was found that only 52.6% of the fees claimed should be awarded which is $783,491. *See Harman v. Lyphomed, Inc.*, 734 F.Supp. 294, 298 (N.D.Ill.1990) (*"Harman I"*). As a check on this amount, the court also considered the allocation of work between partners, associates, and paralegals. Using this method, and adjusting the rates charged, it was estimated that $953,750 would be reasonable. *See id.* at 298. Relying on the two figures, it was determined that $950,000 was a reasonable lodestar. *Id.* It was also determined that counsel was not entitled to a multiplier, *id.*, and that the percentage method would not be used. *Id.* at 299.

Counsel timely moved for reconsideration, raising a number of arguments. The court determined that, instead of reducing the rates as had originally been done, the rates claimed would be used in making a projection under the partner/associate ratio approach. On reconsideration, the fee award was increased to $1,050,000. *See id.* at 301.

The Seventh Circuit vacated this court's award. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969 (7th Cir.1991) (*"Harman II"*). The Seventh Circuit upheld the sampling method employed, but held that application of the partner/associate ratio as a guide was not adequately supported. *Id.* at 975. While indicating that a percentage method would have been permissible, the court held that it was not mandatory and that the lodestar/multiplier approach was permissible. *Id.* at 973–75. The court also held that the question of applying a multiplier had not been adequately considered and required further development on remand. *Id.* at 976.

Following the remand, this court appointed a special master to recommend the fee to be awarded. Counsel declined to submit additional documentation of the lodestar to the master. Instead, counsel argued the proper lodestar is the $1,489,526 originally requested. Counsel also offered to accept a "compromise" amount of $1,250,000. Counsel suggested a multiplier of approximately 2. Primarily, however, counsel argued that the percentage method should be employed and that an appropriate percentage would be 27.5% of the settlement amount.

The master recommended that the court apply a percentage method based on the point in the litigation at which the case was terminated. Given that this case was settled before the completion of discovery, the magistrate recommended that the figure of 20% be used. Alternatively, if the lodestar/multiplier method were to be used, the master recommended using the $783,491 figure and a multiplier of 2. Counsel requested reconsideration from the master who declined to revise the 20% recommendation. The master, however, changed his report to assume the lodestar was $1,050,000 instead of $783,491. A copy of the master's revised report is attached hereto as Appendix A.

Counsel have filed objections to the master's report. Counsel do not dispute the percentage approach taken by the master, but argue that the case was further developed than the master considered it to be. Counsel argue their award should be 25%. If the lodestar/multiplier method is to be used, counsel again suggest a lodestar of $1,489,526 or the compromise figure of $1,250,000. The requested multiplier is 2.

Initially, it is noted that this is not a question of negotiation between the court or master and class counsel. Class counsel should not suggest "compromise" amounts. Had someone been appointed to represent the class against counsel on the fee issue, then negotiation and compromise with such a representative would be possible. That, however, is not the role of the court or the master, both of whom are neutral decisionmakers seeking to determine a fair, just, and appropriate fee. Thus, both the court and the master have sought to determine an appropriate fee; class counsel are not viewed as opponents to whom a low amount might be offered with the ultimate goal of achieving a compromise at a higher figure.

■ The first question to consider is whether to apply a percentage method or the lodestar/multiplier. As was discussed in *Harman I,* 734 F.Supp. at 299, both methods have their advantages and disadvantages. On appeal, the Seventh Circuit approved continued use of the lodestar method. *Harman II,* 945 F.2d at 974. Implicit in this discussion, however, is a recognition that the district court also has the discretion to employ the percentage method. The master's discussion of an appropriate percentage methodology to use is thoughtful and thorough. While recognizing that there may also be other methods for determining an appropriate percentage, the methodology employed by the master is found to be acceptable and his conclusion of a 20% award is found to be consistent with the facts before the court. The mas-

ter's conclusion and recommendation as to a percentage award is adopted by the court and the master's January 31, 1992 report is appended to this order. Counsel will be awarded fees equal to 20% of the settlement amount plus accumulated interest on that amount. As recommended by the master without objection, counsel will also be reimbursed for $131,900 of costs plus the accumulated interest.

In reaching his conclusion, the master first considered that the settlement reached was neither extraordinarily high nor extraordinarily low and therefore no adjustment was necessary based on the amount of the settlement. Therefore, under the methodology set forth in the master's report appended hereto, an appropriate award would be between 15% and 30% depending on the point in litigation at which the case concluded. This case was settled early enough in the proceedings to justify only an award of 20%, not the 25% that counsel now argue they are entitled to receive.

Besides their argument as to how far the case proceeded prior to settlement which the court rejects, counsel point to other cases in arguing that the 20% award is low. The data provided by counsel is either inaccurate or not verifiable. Counsel refer to four recent class action cases from this district in which they claim the fee awards equalled 25% to 30% of the settlements. It is unclear if counsel contend the fee awards were expressly made as a percent-

age of the settlement or if they are simply reporting what the awards were as a percentage. The only one of the four cases cited that could be found on the computer database checked was *In re VMS Ltd. Partnership Securities Litigation*, 1991 WL 134262 (N.D.Ill. July 16, 1991) (Zagel, J.). This order does not set forth how the amount of fees was determined.

The court's research of recent reported class action securities fraud cases from this district reveals five cases awarding fees, all of which applied the lodestar/multiplier method. None of these cases were cited to the court by counsel, although all but *Rudolph* involved a number of the attorneys who also represent the *Harman* class. As a percentage of the settlement (or in one case damages) obtained in these cases, the fee awards represented approximately 10% to 22%. *See In re Telesphere International Securities Litigation*, 753 F.Supp. 716 (N.D.Ill.1990) (Shadur, J.);[1] *In re Continental Illinois Securities Litigation*, 750 F.Supp. 868 (N.D.Ill.1990) (Grady, J.);[2] *In re Security America Corporation Securities Litigation*, 750 F.Supp. 352 (N.D.Ill. 1990) (Alesia, J.);[3] *Rudolph v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1990 WL 7168 (N.D.Ill. Jan. 18, 1990) (Williams, J.);[4] *In re Gould Securities Litigation*, 727 F.Supp. 1201 (N.D.Ill.1989) (Aspen, J.).[5]

Counsel also provide a "Table of Percentage Fee Award Cases" with the *Class Action Reports* article cited as the purported source. Counsel list 43 cases with all but

1. The settlement fund was $1,519,500 and the fee award was $329,395 which is 21.7%. The multiplier awarded was 1.09.

2. There was a $38,000,000 settlement fund and the fee request was approximately 22% of that amount. The total fees actually allowed is not stated in the case. However, *Attorney Fee Awards in Common Fund Securities & Antitrust Class Actions*, 13 Class Action Reports 249, 428 (1990) ("*Class Action*"), reports that, including interest, the total recovery was $45,000,000 and that the fee award, including interest, was $4,646,619 which is 10.3%. In this case, no multiplier was awarded and the maximum rate permitted was $175 per hour.

3. The class was awarded $7,799,951 on a successful summary judgment motion and another $7,385,000 was obtained in settlements for a

total of $15,184,951. The fee award of $1,734,-458 is 11.4% of the total amount obtained for the class. The multiplier awarded in this case was 1.25.

4. The settlement fund was $10,000,000. The fee awarded was $1,495,923 which is 15.0%. A multiplier of 2 was allowed for one attorney and other attorneys were awarded multipliers of 1.48 and 1.69.

5. The settlement fund was $10,000,000. The case, 727 F.Supp. at 1210, indicates fee awards totaling $2,041,073 which does not include one attorney's supplemental claim that was still pending. This is 20.4% of the settlement amount. (*Class Action* at 310 reports the fee award as $1,926,170, which would be 19.3%.) Multipliers of 1.75 for lead counsel and 1.25 for other counsel were awarded.

three awarding 25% or more and none awarding less than 22.5%. It is not clear where in the article this information is obtained from. The first case counsel list is *In re Ampicillin* which they report as a 45% award. *Class Action* at 482, though, reports that fees and costs awarded in *Ampicillin* were 10.7% of the initial settlement and 45% of the additional settlement which comes to a fee and costs award of 25.5% of the total settlement.[6] There is no indication in *Class Action* that the fees were computed on a percentage basis. In any event, *Class Action* at 555 provides a table of the 39 covered cases that it treats as percentage award cases.[7] All are securities class actions except one case which is an antitrust class action. Adding together all the recoveries and all the fee awards,[8] the fees awarded are 11.2% of the recoveries. This figure, however, is distorted by the *Standard Oil* case which represents about 55% of the recoveries, but only awarded fees of 3.2%. Eliminating the *Standard Oil* case from the table totals, the fees awarded are 21.0% of the recoveries. The median award for the 39 cases on the table is 25.9%. The median may be the more appropriate number to consider given the wide range of recoveries included in the table.[9] Eleven of the cases had recoveries between 5 and 15 million dollars [10] which is a range within which the *Harman* settlement falls. The percentage fee award for these cases ranged from 15.8% to 32.0%, with a median of 25% and total fees awarded being 24.4% of total recoveries. According-

ing to the analysis of *Class Action* at 554, percentage awards resulted in attorneys obtaining hourly rates 64% higher than if the lodestar/multiplier method had been applied.[11]

The Northern District of Illinois and *Class Action* data discussed show that counsel's contention that the 25% they seek is a low percentage compared to other cases is not true. The data instead shows that 25% is in the middle of the scale, not at the bottom end. Awards of 15 to 30 per cent are not unusual. The data also indicates that 25% is a high amount compared to cases employing the lodestar method. As previously stated in *Harman I*, 734 F.Supp. at 299–300, and in accordance with the master's methodology, this is a case in which the percentage should be below the average, not at the middle or high end of the scale. Twenty per cent is an appropriate percentage to employ.

In *Harman II*, 945 F.2d at 974, the Seventh Circuit suggested that the award resulting from applying the multiplier/lodestar can be checked against the amount that figure represents as a percentage. It would also be appropriate to check a percentage award against the lodestar amount. As a practical matter, that is not a check that ordinarily would be performed given the amount of work required to determine a lodestar. Given the posture of the present case, though, determining a lodestar will not be a difficult task, the

---

6. Considering fees only (which is all that is being considered for the *Harman* counsel on a percentage basis), the fee award is 19.9% as reported in *Class Action*.

7. The first page of the table provided by counsel lists 9 cases. None are included in the table reported in *Class Action*. No further comparisons between counsel's table and the table in *Class Action* were made; the court instead relies on the table in *Class Action*.

8. Again, the column for fees is used, not the column for fees *and costs* which is what *Class Action* uses in reporting a percentage.

9. Recoveries ranged from $425,000 to $70,000,-000, except for the $618,000,000 recovery in the *Standard Oil* case.

10. More precisely, the recoveries were $5,200,-000 to $13,584,000.

11. It is also noted that, for *all* securities cases covered by the study, fees and costs awarded were 15.2% of that recovered by the class. *Class Action* at 546. The average multiplier was 1.72. *Id.* For securities cases in the $5–10,000,-000 and $10–20,000,000 ranges, costs and fees as a percent of recovery were respectively 25.8% and 25.9% with respective average multipliers of 1.53 and 1.75. *Id.* Eliminating the high and low cases considered to be aberrations, fees and costs for all securities and antitrust cases were 14.8% of the class recoveries and the average multiplier was 1.83. *Id.* at 548. These figures are for fees and costs. Total fees awarded for all cases were approximately 83.6% of total fees and costs awarded. *See id.* at 545.

papers having previously been presented and analyzed.

Since only being done as a check, it is not essential to do a precise computation. The master's assumption of a $1,050,000 lodestar and a multiplier of two, though, is not what this court would conclude to be an appropriate lodestar.

Class counsel has been given ample opportunity to prove it is entitled to a lodestar of $1,050,000, $1,250,000, or even more. Initially, the submission of counsel was rejected as not adequately organized and as containing insufficient specificity. *See Harman I*, 734 F.Supp. at 296. The revised request was still deficient, but the court used what was available to make its own computations. *See id.* at 296–97. On reconsideration, counsel complained they were not given an adequate opportunity to provide additional documentation, but did not provide any additional documentation and had only minor objections to the court's computations. *See id.* at 300–01 & n. 3. After the remand, the master again gave counsel an opportunity to submit additional documentation or make specific arguments regarding an appropriate lodestar. Counsel declined the opportunity to submit anything additional or to make any substantial argument.

Given that counsel declined to submit any additional documentation or argument regarding an appropriate lodestar, the master initially assumed that the lodestar computed by the sampling method was accurate. Citing *Harman I*, 734 F.Supp. at 301, counsel argued on reconsideration that the figure determined by the sampling method was only a guide and that the master should assume the final figure of $1,050,000 was correct. The master accepted this argument and modified his report.

In determining both the initial figure of $950,000 and the final figure of $1,050,000, this court used both the sampling method

and the partner/associate ratio as guides. Before the Seventh Circuit, counsel successfully argued that the court should not have considered the partner/associate ratio and that was one basis for the remand. Therefore, the $1,050,000 lodestar figure would have to be reconsidered, but only in light of the limited lodestar argument presently pursued by counsel.

The Seventh Circuit approved the sampling methodology. *See Harman II*, 945 F.2d at 975. *Accord Evans v. City of Evanston*, 941 F.2d 473, 476–77 (7th Cir. 1991). Taking into account that some additional documentation was presented on reconsideration, *see Harman I*, 734 F.Supp. at 301, the sampling method is found to produce a rounded off figure[12] of 55% of the claimed fees being allowed. Fifty-five per cent of the $1,489,526 claimed is $819,239 which can be rounded to $820,000. No adequate reason being presented for determining a lodestar higher than the amount shown by the sampling methodology, this amount will be used as the lodestar.

The next question is whether a multiplier should be awarded. While leaving this issue to be resolved by this court if necessary, the Seventh Circuit indicated that there was "some probability" that a multiplier would be appropriate. *Harman II*, 945 F.2d at 976. The Seventh Circuit held that risk, viewed as of the time the case was first taken by the attorneys, is the only factor to consider.[13] *Id.* *See also Skelton v. General Motors Corp.*, 860 F.2d 250, 255 (7th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); *Littlefield v. McGuffey*, 954 F.2d 1337, 1351–52 (7th Cir.1992).

In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 733, 107 S.Ct. 3078, 3091, 97 L.Ed.2d

12. In *Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir.1988), Judge Posner suggests that rounding off is more appropriate than using precise figures.

13. In their original petition, counsel argued that the quality of their work, the quality of the result, and the complexity of the case should be

considered in awarding a multiplier. This court, however, held that those factors did not provide any basis for awarding a multiplier. *Harman I*, 734 F.Supp. at 298. Such a conclusion is consistent with the Seventh Circuit's holding that only risk should be considered.

585 (1987) (O'Connor, J., concurring),[14] the Supreme Court held that risk does not form a sufficient basis for awarding a multiplier unless the prevailing party would have had difficulty finding counsel in the relevant market. *Accord Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 553 (7th Cir.1991). Justice O'Connor also indicated that the risks peculiar to the case generally are not to be considered; instead the focus should be on how the relevant market compensates for risk. *Delaware Valley,* 483 U.S. at 734, 107 S.Ct. at 3091. *See also Bauman v. Jacobs Suchard, Inc.,* 1991 WL 125952 (N.D.Ill. June 27, 1991). In *Skelton,* 860 F.2d at 255–57, the Seventh Circuit applied the *Delaware Valley* principles to a common fund case resulting from settlement of a case that included claims that had statutory fee provisions.

In the present case, this court found that the large number of attorneys that were willing to take on this case from its beginnings indicated that this was not a case in which a multiplier was necessary to attract counsel. *See Harman I,* 734 F.Supp. at 298. *Cf. In re Continental Illinois Securities Litigation,* 750 F.Supp. 868, 895 (N.D.Ill.1990). Also, prior to the filing of any of the suits, the Food and Drug Administration had already ordered that certain corrective actions be taken that were part of the injunctive relief sought by the plaintiffs in the various lawsuits. This was not a case which, on the particular facts of the case viewed from the beginning of the dispute, involved substantial risk. It did, however, involve some risk. Therefore, looking only to the particular facts of this case, it is found that there was risk involved and therefore application of some level of multiplier would be appropriate.

The law is unsettled as to how the particular facts of the pending case should be considered in analyzing the risk involved. The Seventh Circuit has not expressly addressed the issue which is clearly raised by Justice O'Connor's concurrence. The Seventh Circuit, without discussion, has contin-

ued to uphold rulings on multipliers based solely on the particular facts of the case. *See, e.g., Littlefield,* 954 F.2d at 1351–52. The Third Circuit appears to hold that only facts about the relevant market can be considered and not the facts of the particular case. *See Blum v. Witco Chemical Corp.,* 888 F.2d 975, 981 (3d Cir.1989). The District of Columbia Circuit had also so held, *see McKenzie v. Kennickell,* 875 F.2d 330, 334 (D.C.Cir.1989), but recently overruled that case, instead holding that Justice O'Connor's concurrence cannot be relied on as expressing the views of the Supreme Court in *Delaware Valley* and that multipliers are never allowed in statutory fee cases. *See King v. Palmer,* 950 F.2d 771 (D.C.Cir.1991) (en banc). In a recent decision, the Eighth Circuit held that the prevailing plaintiff was not required to prove that she had actually faced difficulty in obtaining counsel, but still went on to discuss that she had successfully made such a showing and this still appeared to be relevant to the determination to award a multiplier. *See Morris v. American National Can Corp.,* 952 F.2d 200, 205–06 (8th Cir. 1991).

█ This court is bound to follow the Seventh Circuit which, unlike the District of Columbia Circuit, continues to hold that Justice O'Connor's concurrence is to be considered the Supreme Court's holding in *Delaware Valley.* The Seventh Circuit also continues to consider the particular risks of the individual case. These two Seventh Circuit holdings, however, can be reconciled. Justice O'Connor specifically stated that the applicant for fees must "establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Delaware Valley,* 483 U.S. at 733, 107 S.Ct. at 3091 (O'Connor, J., concurring) (quoting Justice White's plurality at 731). This seems to refer to the consideration of the particular facts of the case before the

---

**14.** The Seventh Circuit has held that Justice O'Connor's concurrence should be considered as representing the majority view of the Supreme Court as to risk multipliers. *Skelton,* 860 F.2d at 254 n. 3; *Littlefield,* 954 F.2d at 1351; *Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 553 (7th Cir.1991).

court. Justice O'Connor also stated: "Finally, a court should not award any enhancement based on 'legal' risks peculiar to the case." *Delaware Valley*, 483 U.S. at 734, 107 S.Ct. at 3091 (O'Connor, J., concurring). This appears to exclude consideration of individual facts. The two statements, though, can be reconciled in light of Justice O'Connor's discussion of the market setting the appropriate rate of compensation. *See id.* at 733, 107 S.Ct. at 3090. In light of Seventh Circuit precedent and *Delaware Valley*, it is held that the individual facts are to be considered in determining *if* plaintiffs faced a risk that justifies awarding a multiplier, but that cases in general are to be considered in determining the *amount* of the multiplier.

As previously discussed, this case involved some risk and therefore the award of a multiplier is appropriate. This court recently held that, without regard to the particular facts of a case, the appropriate multiplier for complex federal litigation in this district is 1.75. *See Bauman*, 1991 WL 125952. Therefore, a multiplier of 1.75 would be permitted. If only the particular facts of the case were to be considered, however, the multiplier would be more in the area of 1.25.

Under the lodestar/multiplier approach, fees in the amount of $1,435,000 (1.75 times $820,000) would be awarded. This is 14.5% of the settlement amount. If a multiplier of only 1.25 were used, the award would be $1,025,000 which is 10.4% of the settlement amount. Even the master's suggestion of $2,100,000 as a lodestar/multiplier award is still only 21.2% of the settlement amount. Counsel's suggested "compromise" amount, which is still an overstated amount, and a lodestar of 1.75 or 1.25, produces a result of $2,187,500 (22.1%) or $1,562,500 (15.8%). Using a multiplier of 2 and the compromise amount would produce an award of $2,500,000 which is 25.3%. Both those numbers, however, are higher than what a proper lodestar/multiplier should be. If anything, consideration of the lodestar/multiplier amount indicates the award should be less than 20%, not more than 20%. The 20% figure, however,

is still found to be within a reasonable range for a percentage.

The court adopts the master's recommendation of awarding fees equal to 20% of the settlement amount and expenses of $131,-900.

IT IS THEREFORE ORDERED that the Clerk of the Court is directed to enter judgment awarding plaintiffs' counsel $2,129,900 representing $1,998,000 in attorneys fees and $131,900 expenses payable out of the class settlement fund, plus interest accrued from December 22, 1989 to the date of disbursement from the settlement fund escrow account.

## APPENDIX A

### REPORT OF SPECIAL MASTER

On December 23, 1991, Charles W. Murdock was appointed special master to consider the request of plaintiff counsel for attorneys' fees and expenses in light of the decision of the Seventh Circuit Court of Appeals, entered October 9, 1991 (945 F.2d 969), and to submit a recommendation and report to the trial judge by January 17, 1992, later extended to January 24, 1992 because of additional submissions.

The trial judge determined a fee of $1,050,000 based upon the lodestar approach but with a readjustment of staffing ratios (partner: associate: paralegal) so as to reduce the submitted lodestar of $1,376,-423 to a pro forma lodestar of $1,050,000. The reduction was apparently influenced by his opinion that the hours presented by counsel involved duplicative efforts. He employed a sampling procedure on certain activities that indicated that only 52.6% of the time spent on such activities was reasonable. The trial judge declined to apply a multiplier because an incentive was not necessary to attract counsel to the case. The trial judge also declined to use the percentage-of-the-fund method for determining fees. Finally the trial judge awarded expenses of $121,277 but disallowed $10,623 attributable to computer assisted research.

The Court of Appeals approved the use of a sampling procedure, but rejected his

use of a pro forma staffing ratio to project reasonable time on the basis that there was no showing such ratio mirrored existing patterns of litigation practice. The Court of Appeals also agreed with plaintiff counsel that "counsel is probably entitled to a contingent multiplier, as there was some probability that the suit would not result in success for the plaintiffs" (945 F.2d at 976) and thus no fee for the attorneys. Finally, the Court of Appeals, though recognizing problems in the lodestar approach, found it "premature to banish it now." 945 F.2d at 974. However, the Court of Appeals "[did] not rule out use of the percentage method when the district court finds it appropriate.... The decision whether to use a percentage method remains in the discretion of the district court." 945 F.2d at 975.

*I. Choice of Lodestar Versus Percentage Approach for Fees in Common Fund Cases*

Subsequent to its adoption by the Third Circuit in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), *appeal following remand,* 540 F.2d 102 (3d Cir.1976), the "lodestar" method of determining attorneys' fees in common fund cases has been subject to significant criticism. Four of the major criticisms of the lodestar approach are (i) that it creates a lawsuit within a lawsuit and pits plaintiff counsel and the trial judge against each other in an adversary posture; (ii) that it encourages "loading" hours so as to justify a high fee; (iii) that it creates the illusion of mathematical precision while being subject to vagaries, manipulation, and lack of precision; and (iv) that it discourages early settlement. On the other hand, the percentage method avoids the foregoing problems but carriers with it the liability of producing a windfall. However, if the percentage method can be modified to have some correlation with the value of time expended, it would then be preferable to the loadstar method.

*a. Adverse Impact on Judicial System.*

*Arguably,* the first three criticisms are reflected in the present proceeding. The trial judge, after settlement of a common fund case, becomes a fiduciary for the beneficiaries, to protect their interests from their former fiduciaries, their attorneys, who now have a conflict of interest in that plaintiffs and counsel now compete for their respective interests in the common fund. As the Third Circuit Task Force stated:

> In these situations, the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit. The perspective of the judge also changes because the court now must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function—the defendant has no interest in how the fund is distributed and the plaintiff class members rarely become involved.

Court Awarded Attorney Fees—Report of the Third Circuit Task Force, October 8, 1985, 108 F.R.D. 237, 255.

In this case, the trial judge questioned the amount of time expended on certain activities, postulated pro forma staffing ratios, revised hourly rates, and, according to counsel, failed to recognize the risks inherent in the litigation. This led to the appeal of his order on fees and subsequent remand and referral to a special master. Not only does this consume extensive judicial time but creates an unseeming relation between bench and bar. Such a situation does not engender confidence in the public that this is a fair and sensible system even though both principals in the process are seeking fairness—the trial judge to protect the common fund for the plaintiff beneficiaries and the attorneys to receive fair compensation for their time and expense, for the cost of financing the litigation for possibly many years, and for the risk that they may receive nothing.

### b. Potential for Duplicative Time in Multiple Law Firms Representation.

On the issue of excessive time, the trial judge reviewed three activities for which $123,438 was claimed as fees and concluded that only $64,897, or 52.6%, was reasonable. Determining whether the lodestar hours are reasonable is an obligation of the trial judge in the lodestar system. It is also the obligation of the special master when a fee matter is referred for recommendation. In order to develop a perspective as to whether loading has occurred, it is necessary to obtain the time and subject entries, not just for each attorney, but for all attorneys who worked on the matter with the composite time of all attorneys grouped chronologically by subject matter. Otherwise the reviewer is consigned to spending hours cross-checking the time of various law firms to determine when duplication has occurred and whether a reasonable amount of time was spent upon any particular matter.

The special master requested that attorney time be presented in such fashion. Counsel for petitioners explored with class counsel the question of law firm time being presented in the manner requested by the special master and was advised that there is no computer base or other method for collating that information in that form other than by hand and at substantial time and expense. In view of the foregoing response, the special master has not revisited the issue of whether the time expended was reasonable and has assumed that the lodestar of $1,050,000, as determined by the trial court is the appropriate number to use with regard to the fee petition. This decision not to revisit the reasonableness of the hours expended was reinforced by the decision to recommend a percentage approach. However, the issues that arise from the obligation of the trial judge to determine the reasonableness of the hours expended by attorneys in the lodestar approach was a significant factor in determining to use a percentage approach.

### c. Illusion of Precision.

While issues such as the adversarial relation between bench and bar and the subject of excessive time clearly go to the efficiency and integrity of the system, the issue of mathematical precision does likewise, though in a less obvious manner. This is particularly true with respect to the multiplier. Some of the justifications for the multiplier include "the complexity of the litigation, the novelty of the issues, the high quality of representation, the ' "great benefit" to the class, and the "riskiness" of the lawsuit.' " *Blum v. Stenson*, 465 U.S. 886, 898 [104 S.Ct. 1541, 1548, 79 L.Ed.2d 891] (1984). In commenting on *Blum*, the Third Circuit Task Force summarized the rationale of the Supreme Court in rejecting a multiplier as follows:

"[The Supreme Court] reasoned (1) that novelty and complexity of issues already are reflected in the lodestar, (2) that only in that "rare case" in which the fee applicant offers specific evidence to show the superior nature of the services rendered and that exceptional success was achieved should quality of representation be a basis for increasing the lodestar, and (3) that no evidence in the record justified an increase based on the number of persons benefited. As a contingency, the court noted that the fee applicants did not demonstrate any risks in their affidavits or brief to the district court and therefore an increase in the lodestar on that basis was unjustified." 108 F.R.D. at 264.

While *Blum* was a statutory fee case rather than a common fund case, some of the reasoning is equally applicable to a common fund case in which the lodestar approach is used to compensate plaintiff counsel. "Novelty" and "complexity" factors should be impounded in the lodestar itself in terms of the hours expended and the hourly rate. A more complex case will normally take more hours and the hourly rate "charged" by plaintiff counsel will normally reflect the sophistication necessary to deal with novel and complex issues (the "senior" partner rates charged by Chicago, Philadelphia, and New York firms were $300, $325, and $360 respectively;

*Harman*, 734 F.Supp. at 296). Also as the Supreme Court noted, it is the rare case in which "exceptional" success was achieved. The rationale for rejecting quality factors in determining a multiplier is well summarized by the Third Circuit Task Force:

"[T]he quality factor should be eliminated from consideration. This factor is superfluous since it reflects the type of performance expected of all attorneys and theoretically already has been taken into account by the district court in setting standardized rates. Moreover, assessing the quality factor involves too subjective an inquiry and is thought to be subject to potentially discriminatory application, thereby potentially undermining the legal community's faith in the fee-setting process. Finally, exceptionally fine lawyer performance in a case often will be rewarded under one or more of the other adjustment factors...." 108 F.R.D. at 265.

However, the reasoning of the Supreme Court in negating a multiplier because of the riskiness of the lawsuit is not relevant to a common fund case taken by plaintiff counsel on a contingent fee basis. It would be the extraordinarily rare case where a contingent fee case did not involve some risk of no fee to plaintiff counsel. Again the rationale of the Third Circuit Task Force is persuasive:

"[T]he contingency factor, which [the Task Force] defines simply as 'the risk of winning or losing,' should be considered in all cases. Plaintiffs' attorneys always face the prospect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process." 108 F.R.D. at 265.

However, justifying the appropriateness of some multiplier does not provide much guidance on the appropriate multiplier. The Seventh Circuit noted that multipliers "between one and four ... have been approved." 945 F.2d at 976. It also observed that multipliers of four are rare. *Id.* However, counsel for petitioners have furnished the special master an exhibit of 35 cases involving multipliers of 3 to 4.67. Ten involved multipliers of 4 or more.

But what is the basis for choosing a multiplier of 4.67 instead of 4.66; or 3.49 instead of 3.47. On, more pertinently in the case at bar, why did plaintiff counsel seek a multiplier of 2.177 (see 945 F.2d at 971) instead of 2.176 or 2.178. The answer is that plaintiff counsel started with a percentage approach, seeking 30% of the fund, determined a target fee of $2,997,000 and then backed into a multiplier by dividing the target fee by the lodestar. If this is what we do, why not call a spade a spade instead of obfuscating the process and pretending that a $2.997 million targeted fee was determined by the product of the precise time expended and a number, the identity of which is supposedly objective and independently significant?

Clearly, there is a wide range in multipliers that courts have used. Most likely the range is a function of a court determining a reasonable aggregate fee and then backing out a multiplier. It strains credibility that a court would begin the process of determining a reasonable fee by first conceptualizing a number such as 4.67 or 2.177. Thus, there is no inherent precision in the multiplier.

There is another problem with multipliers, at least as conceptualized by the Seventh Circuit. The Seventh Circuit instructed that "the judge should view the multiplier from an *ex ante* perspective; that is, what size risk the attorney assumed at the outset by taking this type of case." 945 F.2d at 974. *See also id.* at 976. If this means "how risky is this particular case," then both the trial judge and plaintiff counsel are placed in somewhat of a bind.

From the trial judge's perspective, he may not see the case as risky at all. Indeed, in the case at bar, the trial judge stated that "[t]his was not a particularly risky case to assume." 734 F.Supp. at 300. The trial judge may have already upheld the complaint against a motion to dismiss. But would another trial judge have ruled the same way? Or might the Court of Appeals later reverse? Will the facts

pleaded prove out? Will the law change? To require the trial judge to make, with respect to the particular case at bar, a "retroactive calculation of the probability of success as measured at the beginning of litigation" (*Skelton v. General Motors Co.*, 860 F.2d 250, 258 (7th Cir.1988)) is to place a substantial burden on him.

As the Seventh Circuit recognized in *Skelton*, arguing for a multiplier also places a substantial burden on plaintiff counsel. If the multiplier accounts for the riskiness of the case, then the riskier the case, the greater the likelihood of loss, and the greater the multiplier if successful. But then plaintiff counsel is placed "in the unseemly position of convincing the court that their clients' case was weak." *Skelton*, 860 F.2d at 258. Was this merely a strike suit to which defendants capitulated?

Thus, the proper perspective is not so much how risky is this particular case but how risky is contingent fee litigation. Arguably, in general, "lawyers in successful [contingent fee] cases [should] receive a fee twice what they would have received from clients whose payment is not contingent on success." Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 511 (1981). Indeed the Seventh Circuit has stated that "doubling of the lodestar would provide a sensible ceiling." *Skelton*, 860 F.2d at 258.

The lodestar itself is not necessarily "true" in the sense of unassailably objective. Courts are charged with insuring that the time spent is reasonable. In the case at bar, the proffered lodestar was $1,376,423. In his own extension of time and hours, the trial judge calculated total time as $1,489,526. Based upon redundancy in time, the trial judge could have calculated a lodestar of $783,491, based upon a sampling that showed only 52.6% of the time was reasonable, if he were to have assumed that the 52.6% ratio was applicable to all the time submitted. Instead he recalculated staffing ratios and average time and allowed a lodestar of $1,050,000. Counsel for petitioners have suggested a compromise lodestar of $1,250,000. Thus the lodestar itself is not a precise and absolutely determinable number. The process of determining a reasonable contingent fee is closer to "by guess and by gosh" than it is to objective mathematical formulae.

## II. How Best to Compensate for Risk

When you accept the premise that a substantial part of the fee is a function of risk, then the actual time expended becomes less of a factor in determining compensation. For example, consider a simplified model that assumes that all cases have the same dollar value to the respective classes, and that plaintiff counsel (i) consistently take cases which have a 50% chance of success, (ii) litigates all cases to judgment with no appeal and prompt payment of the judgment, and (iii) expends billable hourly charges equal to 15% of the judgments obtained.

If plaintiff counsel were to be compensated on a contingent basis, plaintiff counsel would need to be compensated in the successful cases on a basis equal to 30% of the judgment. This is because the first 15% compensates plaintiff counsel for the successful case in which fees are allowed, while the second 15% compensates counsel for the unsuccessful suit in which plaintiff counsel bore the risk of attorney time and effort. Adequate compensation could be accomplished in the lodestar method by using a multiplier of 2 or in the percentage method by using 30% as the appropriate determinant.

(What the judicial system needs in this area is more empirical research on just how risky contingent fee litigation really is. If plaintiff counsel in the above example are successful only one-third of the time, then a percentage award of 45%, or a multiplier of 3, would be appropriate because each winning case must "carry" two losing cases. If plaintiff counsel is successful two-thirds of the time, then a percentage award of 22.5%, or a multiplier of 1.5, is appropriate because each winning case need carry only half a losing case.)

Assume, however, that plaintiff counsel receives an offer of settlement early in the litigation at "full value" (assuming we

could ever know what the full value of a case was worth short of it being tried before an all-wise and all-knowing judge or jury). However, at this point in the litigation, plaintiff counsel has expended time equal only to 5% of the value of the case. To what compensation is plaintiff counsel entitled. At this stage of our model development, plaintiff counsel is still entitled (a) to 15% of the settlement offer to compensate counsel for the time expended in the "companion" case which counsel will lose and for which counsel will receive no compensation (assuming such hypothetical case is lost after trial and not early on after a motion to dismiss) and (b) to 5% of the settlement offer which compensates counsel for the time expended in the winning case. Thus, the appropriate percentage award would be 20%. Under a lodestar approach, the appropriate multiplier would be 4 since the time expended in the losing cause would be triple the time expended in the winning case.

The conclusion to be drawn from the model thus far is that the compensation to be awarded to plaintiff counsel to compensate solely for risk bears little relation to the value of time expended. In the first example, the relation between risk compensation and time expended was 1:1; in the second example, it was 3:1. At this stage, plaintiff counsel has not been compensated for the time value of money—defense counsel generally has been paid on a current basis while plaintiff counsel must have the capital base to underwrite both time and expense. However, this burden is removed if, under lodestar, counsel is compensated at current rates (which arguably have kept pace with inflation) or, under the percentage method, interest is paid on the damages recovered. Perhaps there is an additional cost to plaintiff counsel from engaging in a more psychologically stressful type of practice than does defense counsel, but data on stress studies or happy marriages among attorneys does not appear to break out defense counsel from plaintiff counsel. There is, however, a clear entitlement to a fee which will compensate for the risk in taking cases on a contingent basis.

Using the analysis above, we could construct a model in which the percentage award would be 30% or the multiplier in a lodestar would be 2 if the case went to trial, but would be 25%, or a multiplier of 3, if it settled two-thirds of the way through the process (say, after extensive discovery) and would be 20%, or a multiplier of 4, if it settled one-third of the way through the process (say, after investigation, complaint filing and motions to dismiss and the like.)

Unfortunately the real world is not as clean as our model. Obviously, all claims do not have the same full value if successful, nor do all have the same chance of success. As a matter of fact, success may be a function of who is plaintiff counsel. Using the tort model (a frequent analog in analysis in this area), successful plaintiff counsel can be more selective in the cases they accept; moreover, they may find defendant counsel more ready to settle at acceptable figures. But, more importantly, there is not a convenient data base that would support the assumption in the second example that winning cases settle early and losing cases go to trial. It was this supposed relationship that led, arguably, to a percentage award of 20% or a multiplier of 4.

If the reality is that losing cases are subject to an early disposition as often as are winning cases, then an early settlement in a winning case carries no greater burden of underwriting a losing case than a judgment after trial in a winning case carries with regard to an adverse judgment after trial in a losing case. This is because, arguably, uncompensated time in a case lost at trial is offset by the multiplier in a case won after trial when the lodestar will be large, whereas the lodestar and multiplier in a case won early on will merely need to underwrite the uncompensated time in a case which is lost early on. (If only life were that simple!)

Thus, if we continue the assumption that half the cases are winners and half are losers, but now assume also that half of both winners and losers are resolved early, there is no longer a justification for the percentage award of 20%, or the multiplier

of 4, in the case that settles early (that is, one-third through the trial process). In the second example, the assumption was that, in an early settlement, the hourly fees expended were 5% of the value of the settlement but had to carry 15% of the anticipated value of the "companion" case that was lost at trial. However, if the "companion" case was also resolved early, say upon the granting of a motion to dismiss, such that fees equal only to 5% of the anticipated value of the case were expended, then the multiplier in the successful case need only be 2:1, or the percentage award need only be 10%, for the system to provide adequate compensation.

A conclusion that might be drawn from the simplified model thus far is that the multiplier generally ought to be 2:1 or that the percentage award ought to 10% for any early settlement, 20% for settlement after discovery but before trial and 30% for judgment after trial. However, the foregoing figures do not seem to reflect the pattern that exists thus far in the Northern District, so additional analysis is necessary before coming to conclusion.

The Third Circuit Task Force, in recommending a percentage approach rather than a lodestar approach in common fund cases, suggested that "[i]n order to promote early settlement, the negotiated [percentage] fee could also provide a percentage or fixed premium incentive based upon how quickly or efficiently the matter was resolved." 108 F.R.D. at 256. This could argue in favor of reversing the percentage progression suggested above by awarding 30% if the case were settled early, 20% if settled before trial, and 10% of any judgment obtained after trial.

Such an inverse approach, while clearly destroying any relationship of fees to time expended, would certainly further the policy of encouraging settlements. But what of the cost? Such an approach would create a substantial conflict of interest between plaintiffs and plaintiff counsel and would give substantial leverage to defense counsel. The conflict between client and counsel is easy to appreciate. If a case is intrinsically worth $3.0 million, counsel will obtain a fee of $300,000 if it goes to trial (using the 10% award in an inverse progression). To earn such fee, counsel would expend hundreds of hours of time. However, arguably, the case could be quickly settled for $1.0 million. In such case, plaintiff counsel would realize the same fee, $300,000, but for little expenditure of time. The defendant would also be pleased, having saved both $2.0 million and substantial attorney defense fees. Only the client would be disadvantaged.

This inverse approach would also give tremendous leverage to defense counsel. The longer the case goes and the greater the investment that plaintiff counsel has in terms of time and expenses, such as depositions and experts, the less compensation that plaintiff counsel receives. While settlements ought to be encouraged, not at the expense of putting such pressure on plaintiff counsel.

In addition, while settlements must be encouraged, the system must recognize that some cases will go to trial and that counsel must be adequately compensated for the costs of trying a meritorious case. While arguably, the multiplier in a lodestar approach could go down in a case that goes to judgment after trial—from say 4:1 for a case that settles early to 2:1 for a case that goes to judgment—because the multiplier will be applied to a higher lodestar and thus provides a greater dollar "reserve" against the costs of cases that counsel takes that are unsuccessful, the percentage award in a case that goes to judgment should always be higher than in a case that settles. This is because, in a lodestar method of computation, plaintiff counsel will always be compensated for the time committed to the case at bar (unless a multiplier of less than one is used) and, in addition, receive a "reserve" equal to the product of the multiplier minus one and the lodestar. Thus, if the lodestar attorney fee time is $1.0 million and the multiplier is 2.5, the fee award will be $2.5 million. Of this, $1.0 will compensate for the time expended in the current case and (2.5–1.0) ($1.0 million) or $1.5 million will be the "reserve" to

compensate for the risk factor in accepting contingent fee cases.

However, the percentage method has no necessary correlation to attorney time expended on the case of bar. For example, again assuming $1.0 million in attorney fees to try a case, if the judgment were $5.0 million and if the percentage awarded is less than 20%, plaintiff counsel will not even recover the cost of time (in the previous paragraph, a lodestar of $1.0 million in attorney time was assumed). Compensable time will always increase the further along a lawsuit progresses and will always be the greatest after trial (disregarding any appeals). Any lodestar with a multiplier greater than one will always reflect a correlation between the amount of time expended and the amount of fee awarded. However, such correlation will exist only in percentage fee cases if the percentage increases as the litigation progresses.

Using a direct relation between the size of the percentage awarded and the progress of the lawsuit may have a positive effect upon encouraging defense counsel to settle. As stated earlier, when there is an inverse relation, defense counsel has leverage in reducing the settlement because, if plaintiff counsel does not settle early, plaintiff counsel compensation decreases (that is, the percentage drops from 30% to some lesser percentage). On the other hand, with a direct relation between the size of the percentage awarded and the progress of the litigation, plaintiff counsel will be compensated if defense counsel prolongs the litigation. However, if it is settled early, plaintiff counsel's fee award will be lesser and that may be factored into the amount of the settlement that defendant will pay, thus encouraging early settlement by defense counsel.

For example, if a 15% fee were awarded in a settlement after the complaint survived a motion to dismiss but a 30% fee were awarded after trial, and if a reasonable "net" to plaintiff was $3.0, it would take $4.3 million to settle after trial but before judgment ($4.3 million minus 30% equals $3.04 million) but only $3.6 million

to settle after the motion to dismiss was granted ($3.6 million minus 15% equals $3.06 million).

The downside, arguably, of increasing the percentage fee award as the litigation progresses is that the percentage award will be afflicted with the same infirmity that the lodestar award supposedly is: it will encourage plaintiff counsel to extend the litigation to support a higher fee. However, any percentage award should always compensate plaintiff counsel for the risk of contingent fee litigation. This portion of any award should probably be in the 10%–15% range.

Thus, if plaintiff counsel could settle a $3.0 million lawsuit the day after a complaint was filed—and if 300 hours were expended in investigating and filing the complaint—the fee of $450,000 would generate an hourly rate of $1500 per hour. Viewed differently, and assuming a reasonable average hourly rate of $200 per hour, $60,000 of the fee would compensate for time expended and the other $390,000 would be the "reserve" to compensate for the risk of contingent fee litigation.

While the same result could be accomplished under the lodestar approach, to generate a $450,000 fee on $60,000 of time would require a multiplier of 7.5. While a court could award such a multiplier, it is unlikely that it would. Thus, under the lodestar approach, there would be an impetus to load in more hours.

### III. Conclusion and Recommendation

If the proposition is accepted (i) that plaintiff counsel in any successful case is entitled to some premium to compensate for the risk of contingent fee litigation and (ii) that compensation should bear some relation to time expended, then a percentage approach, which has a floor of 10–15% to compensate for risk and a ceiling of 30% to reflect how far the litigation has progressed prior to settlement, avoids the defects of the lodestar approach and has two substantial benefits: (a) the general public can understand it and (b) there is no illusion of mathematical certainly or precision. From the public, or non-mathematician's

perspective, it may be hard to understand why a higher multiple can be justified early in the litigation and a lower multiple later. More importantly, as in the case at bar, why should the multiplier be 2.177 instead of 2.176 or 2.178? Or 2.376 or 2.083? The plain fact is that lawyers and judges start with the aggregate fee that is perceived as reasonable, then divide the lodestar into the desired fee, and, voila, out comes a multiplier! Decisions should not be made by backing into them.

On the other hand, ordinary people understand percentage fee arrangements. There is a trade off that is both understood and rational: plaintiff counsel may receive what could be perceived as a windfall but that is compensation for undertaking the risk of litigation. It also places the court in the position of making decisions over figures with two significant figures from a mathematical standpoint—15% versus 30%—rather than four significant figures—2.177 versus 2.178. Fees in common cases involve rough equity, not mathematical precision.

Accordingly, in common fund cases where the settlement is neither extraordinarily low nor extraordinary high, the special master recommends a percentage fee award with a range of 15% to 30%. Where the recovery is very modest, these ranges could increase; where the recovery is extraordinarily high, the ranges could be reduced. See Third Circuit Task Force, 108 F.R.D. at 256.

In the case at bar, considering the size of the settlement and the progress of the litigation, a percentage fee of 20% is recommended. The case was settled after motions to dismiss were denied and after substantial document production. Nine depositions, encompassing twelve days of time, were also taken. Transcript of proceedings, Dec. 20, 1989, at 10. Thus, this would produce a fee of $1,998,000 based upon the original base settlement fund of $9,990,000 on December 22, 1989. As of November 29, 1991, the fund had grown to $11,250,000 and the fee should also include 20% of the interest generated by the fund. Were the special master to have used a lodestar approached, he would have applied a multiplier of two, to compensate for risk, against a lodestar of $1,050,000 for a fee of $2,100,000. Thus, while not controlling, the lodestar approach would produce a fee consistent with the percentage method.

With respect to expenses, the hourly rate for attorneys normally captures overhead or internal expenses but the client is billed for third party payments such as for travel and experts. For example, an hourly rate of $300 per hour translates into an annual gross of $540,000, based upon 1800 billable hours. This gross must cover not only compensation to the partner but a proportionate share of overhead. In the past, overhead included such items as rent, library, copying, computers, secretaries, paralegals, health benefits, and administrative staff. In the present lodestar, $57,413 was charged for 808 hours of paralegal time. This averages to about $70 per hour or $126,000 annually for a paralegal. It is doubtful that paralegals average anywhere near $126,000 in compensation. Thus, what was formerly an expense has now been converted into a profit center. This is another reason to move away from the lodestar.

Electronic research has somewhat supplanted library as an item of expense. Arguably, as the trial judge initially ordered, this is an item of internal expense that ought to be captured by the respectable hourly fees or percentage fee award. However, the Seventh Circuit has accepted such charges as a billable expense. Accordingly, expenses in the amount of $131,900, plus interest accrued from December 22, 1989 until the date of disbursement should also be allowed.

Dated: January 31, 1992

Respectfully submitted,
Charles W. Murdock
Special Master