**Arthur Ray BOWLING, et. al., Plaintiffs,**

v.

**PFIZER, INC., et al., Defendants.**

**No. C–1–91–256.**

United States District Court,
S.D. Ohio,
Western Division.

May 24, 1996.

Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley—1, Cincinnati, OH, for Arthur Ray Bowling, Julie Whyle, Janet Boggess, Barbara Finley, Jeffrey Laton Taylor, Emma Carolyn Wright, Archie Calvert, James Pauley, Sonja Lee Bowling, Jeffrey James Whyle, Lawrence Boggess, Jackie Wright, Wanda Calvert.

Harry Bernard Plotnick, Cincinnati, OH, Bruce A. Finzen, Minneapolis, MN, for 183 Individuals, Listed at [38–1], Who Fall Within the Definition of the Purported Class.

Janet Gilligan Abaray, Sherrill Patricia Hondorf, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, Terrence Lee Goodman, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, Fay Elizabeth Stilz, Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Elaine Pauley.

Marc David Mezibov, Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, for Adrienne Fedak, Ronald Dempster, Freda Dempster, Ministry of Health, Province of Alberta, Canada, Ministry of Health Province of Manitoba Canada.

James Ralph Adams, Frost & Jacobs, Cincinnati, OH, for Pfizer, Inc., Shiley Inc., in Irvine, California.

Larry M. Keller, Gary Green, Sidkoff Pincus & Greenn P.C., Philadelphia, PA, Morton B. Wapner, Philadelphia, PA, for Putative Class in Pennsylvania.

Gates Thornton Richards, Gates T. Richards Company, Cincinnati, OH, John T. Johnson, Johnson & Dylewski P.C., Houston, TX, for Nellie Melling.

Elliot Polanieki, Cincinnati, OH, for Objectors Pennsylvania Class.

Thomas Collins Rink, Strauss & Troy, Cincinnati, OH, John Weld Peck, Peck, Shaffer & Williams, Cincinnati, OH, David B. Malone, Peck Shaffer & Williams, Cincinnati, OH, for Robert L. Black, Jr.

Robert L. Black, Jr., Cincinnati, OH, pro se.

Brian Wolfman, Washington, DC, for Public Citizen, amicus.

Vance C. Simonds, Jr., Kasdan Simonds Peterson McIntyre Epstein & Martin, Irvine, CA, for Dutch Consumentenbond, amicus.

Thomas Collins Rink, Strauss & Troy, Cincinnati, OH, Peter J. Strauss, Graydon, Head & Ritchey, Cincinnati, OH, John Weld Peck, Peck, Shaffer & Williams, Cincinnati, OH, David B. Malone, Peck Shaffer & Williams, Cincinnati, OH, for Peter J. Strauss.

### ORDER ON MOTION FOR RECONSIDERATION

NANGLE, District Judge.

Before the Court is Class and Special Counsel's Motion for Reconsideration, Alteration and Amendment (doc. 804) of the Court's Memorandum and Order on Applications for Attorneys' Fees and Expenses, entered in the above-captioned action on March 1, 1996, and amended by Order entered March 12, 1996. Also before the Court are the following: Defendants' Memorandum in Connection With Class and Special Counsel's Motion for Reconsideration (doc. 807); Memorandum of Law of Gary Crane, et al., and *Amicus* Public Citizen (hereinafter collectively referred to as "Public Citizen") In Opposition to Class and Special Counsel's Motion for Reconsideration (doc. 808); Class and Special Counsel's Reply to Public Citizen's Memorandum in Opposition to Class and Special Counsel's Motion for Reconsideration (doc. 809); Public Citizen's Memorandum in Response to Defendant's Memorandum in Connection With Class Counsel's Motion for Reconsideration (doc. 810); Affidavit of John T. Johnson in Support of Request for Reimbursement of Expenses (doc. 811); Class and Special Counsel's Reply to the Memorandum of Public Citizen in Response to Defendant's Memorandum in Connection With Motion for Reconsideration (doc. 828); Public Citizen's Response to Class and Special Counsel's Reply (doc. 829); Public Citizen's Response to Affidavit of John T. Johnson (doc. 834); and Response of Special Counsel James T. Capretz to March 21, 1996 Response of Public Citizen to Motion for Reconsideration (doc. 835). For the reasons set forth below, the Court will grant Class and Special Counsel's motion in part by increasing their award of expenses, but will deny the remainder of the relief sought in the motion.

### BACKGROUND

The history of this litigation as it relates to Class and Special Counsel's joint fee application is set forth in some detail in the Court's Order of March 1, 1996, and will not be recounted herein. In that Order, the Court awarded Class and Special Counsel $10.25 million in attorneys' fees from the common fund created by the class settlement of this case. The Court also held that Counsel would be permitted, as part of their fee award, to make annual applications to the Court for an award of up to 10% of the defendants' annual payments of $6.25 million into the Patient Benefit Fund (a component of the common fund in the case). On March 12, 1996, the Court entered a second Order amending its Order of March 1, 1996, by awarding Counsel an additional $476,938.06 as compensation for the expenses which they had incurred in this case.

On March 11, 1996, Class Counsel, Stanley M. Chesley, along with Special Counsel John T. Johnson and James T. Capretz, filed their motion for reconsideration under Fed. R.Civ.P. 59(e), asserting that the award of $10.25 million for work performed to date is inequitably low, that the procedure established by the Court for the award of future fees is arbitrary and that the award of expenses in the Court's Order of March 12, 1996, does not fully compensate certain Special Counsel for the expenses which they incurred in this case.[1] In support of these assertions, Counsel criticize the Court's Or-

---

[1] Counsel's contention regarding the sufficiency of their expense award was made in their Reply to Public Citizen's Memorandum in Opposition, at 8.

der on a number of grounds, the essence of which is that the Court misunderstood the settlement and failed to recognize the value of Counsel's services. Public Citizen argues in opposition to Counsel's motion that the award of $10.25 million for work which Counsel have performed to date was proper, particularly when compared to Counsel's lodestar, and that the procedure established by the Court for the award of future fees was also proper. Defendants, on the other hand, have taken no position on Counsel's fee award, but nevertheless filed a memorandum in connection with Counsel's motion.

## DISCUSSION

### I. *The Settlement*

In support of their assertion that the award of $10.25 million for fees incurred through August of 1995 is inequitably low, Counsel initially contend that the Court misunderstood the Patient Benefit Fund, undervalued the common fund and failed to recognize the full breadth of benefits flowing from the settlement. Counsel also contend that the Court's suggestion that the Class is declining at a rapid rate is without any factual basis.

### A. *The Patient Benefit Fund and Common Fund*

Counsel argue that the Court mischaracterized the Patient Benefit Fund as a guaranteed fund of only $37.5 million, which may increase to as much as $75 million. According to Counsel, the Patient Benefit Fund is a guaranteed fund of $75 million and, as a result, the total value of the common fund is $165 million.

After reviewing the defendants' and Public Citizen's most recent submissions and again reviewing the settlement agreement, the Court concludes that the defendants are in fact required to continue making annual contributions of $6.25 million to the Patient Benefit Fund until they have contributed a total of $75 million. Supplemented Agreement of

Compromise and Settlement ("Settlement Agreement"), ¶ 5.1. The Court would point out, however, that the settlement agreement is not particularly clear on this point, and the Court's characterization of the Fund as a guaranteed fund of only $37.5 million was based upon the presentation that Class Counsel made at the hearing held September 14, 1995. During this presentation, Class Counsel outlined all aspects of the settlement agreement to assure that the Court had a full and complete understanding of the benefits available to the Class thereunder. Counsel's outline of the Patient Benefit Fund consisted of the following:

> The next aspect of the settlement, which was unique and novel, was a research element called Patient Benefit Fund *of up to $75 million.* Now, that was a *guaranteed thirty-seven-and-a-half million,* and that was a very hard-fought negotiation on the basis that *at the end of the payment of thirty-seven-and-a-half million dollars, the defendants would be able to go to the Court and say—if the Supervisory Panel of six eminent physicians and a lay person come to the conclusion that we have solved all the problems we can ever solve for research, then and only then could they go to the Court and say they shouldn't have to put in the second thirty-seven-and-a-half million dollars.*
>
> If, on the other hand, the Supervisory Fund [sic]—and Class Counsel are allowed to object to them stopping the thirty-seven-and-a-half million and its up to the continuing jurisdiction of the Court to determine the additional thirty-seven-and-a-half million of research. (emphasis added)

Transcript of September 14, 1995 Hearing on Applications for Attorneys' Fees, at 20–21. Class Counsel made this statement on the record and under oath,[2] and he clearly indicated that the Patient Benefit Fund is a guaranteed fund of only $37.5 million, which may increase to as much as $75 million if the defendants do not object or if the Court so orders.[3] Thus, Class Counsel need look no

---

2. The Court had all attorneys participating in the September 27, 1995 hearing sworn in.

3. Class Counsel later stated that defendants "were always guaranteeing 75 million", Tran-

script, at 22, but offered absolutely no explanation of how this statement squared with his detailed explanation of the Patient Benefit Fund.

further than his own words for the reason that the Court characterized of the Patient Benefit Fund as a guaranteed fund of only $37.5 million.

More importantly, the fact that defendants' ultimate payment of $75 million into the Patient Benefit Fund is guaranteed does not affect the Court's analysis of the common fund. The Patient Benefit Fund clearly is not a $75 million fund in the same sense that the Medical and Psychological Fund is an $80 million fund and Spousal Compensation Fund is a $10 million fund. Both of these funds have been fully funded and are being distributed to qualifying class members. Thus, defendants' total payment of $90 million into these two funds equates directly to a benefit of $90 million (less expenses and attorneys' fees) to the Class. Not so with the Patient Benefit Fund.

The defendants have thus far paid only $12.5 million into the Patient Benefit Fund and, beginning this year, are required to make annual payments of not less than $6.25 million into the Fund until they have paid in a total of $75 million. Settlement Agreement, ¶¶ 5.1, 5.5. The first $37.5 million paid into the Fund will presumably, though not necessarily, be devoted to research and development which may or may not yield any benefit to the Class and which, in large measure, was already being carried out by the defendants prior to the settlement. Settlement Agreement, ¶ 5.3.1.[4] As for the second $37.5 million, the defendants may not even begin paying this money into the Fund until the year 2000, with their final payment being due as late as the year 2005. If there is beneficial research still to be done at this time, then the Supervisory Panel can seek Court approval to make further allocations for that purpose, which the defendants can oppose.[5] If the money is not devoted to research and development, then the money will likely go toward paying the medical expenses associated with qualifying valve replacement surgeries or for some other unknown purpose beneficial to the Class. All that is known for certain is that the money will not be distributed directly to class members.[6]

Of course, this Court is not suggesting that the Patient Benefit Fund is not of value to the Class. The Fund must, however, be put in the proper light: The defendants have thus far paid only $12.5 million into the Fund and may take up to nine years to pay in the full $75 million;[7] the primary activity to be paid for by the Fund, research and development, was already being funded by the defendants prior to the settlement; and there is certainly no guarantee that the research and development will yield any specific benefit to the Class. The Court has no doubt that

---

**4.** The defendants were apparently expending substantial sums of money on research and development prior to the settlement. *See* Third Report of the Special Masters/Trustees, Appendix 3, at 1–3, 5 (Court's Exhibit 13); Statements of Kermit J. Smith, Chairman of the Supervisory Panel, Transcript of September 14, 1995 Hearing on Applications for Attorneys' Fees, at 119 (stating that defendants "were spending an amazing amount of money on research" prior to the settlement).

**5.** Once the first $37.5 million is expended, and if no diagnostic technique has been developed or implemented, then the Supervisory Panel can seek Court approval to allocate additional incremental amounts to research and development. Settlement Agreement, ¶ 5.3.1. This requirement permits the defendants the opportunity to go before the Court and argue that further allocations (above $37.5 million) to research and development are not warranted, which is apparently what Class Counsel was attempting to describe at the hearing.

**6.** If at any time, the Supervisory Panel determines that the monies in the Fund cannot be spent productively on research and development, or on expenses related to valve replacement surgery, it may recommend to the Court that the remainder of the Fund be "devoted to some other purpose for the benefit of the Settlement Class (*other than direct distribution to class members*)." Settlement Agreement, ¶ 5.5 (emphasis added).

**7.** Counsel continue to ignore the time value of money. The Court was beginning to think that Counsel were simply not familiar with this concept until reading a footnote in Counsel's motion for reconsideration. Therein, Counsel note the obvious when they point out that the present value of any award they receive in the year 2005 is substantially less than the present value of the award they will receive in 1996. *See* Motion, at 10, n. 17. The Court is constrained to point out that this principle applies with equal force to the defendants' future payments into the Patient Benefit Fund.

the research and development is being industriously pursued with the ultimate goal of providing better diagnostic techniques and surgical procedures for the Class. Even assuming that improved diagnostic and surgical techniques are developed, however, the time-lag inherent in implementing these new techniques makes it impossible to guarantee that this Class, a class which is shrinking at a relatively rapid rate,[8] will derive any meaningful benefit therefrom.

It is, then, completely inappropriate to simply add the ultimate value of the Patient Benefit Fund to the value of the other funds in valuing the common fund. The common fund currently totals only $102.5 million and its present value is clearly something less than its ultimate nominal value of $165 million.

Finally, and perhaps most importantly, the fact that all $75 million of the Patient Benefit Fund is guaranteed has absolutely no effect upon Counsel's award. The $12.5 million thus far paid into the Fund is fully reflected in Counsel's award for services rendered to date. Furthermore, Counsel are permitted to apply for up to 10% of all monies paid into the Patient Benefit Fund, and the fact that the defendants' ultimate payment of $75 million is guaranteed simply assures that there will be more money available in the future from which Counsel may seek an award of fees.

### B. *The Value of the Settlement*

Counsel are apparently under the mistaken impression that, because the Court did not adopt Counsel's self-serving assertion that the value of the settlement is $500 million,[9] it somehow failed to recognize the full scope of benefits available under the settlement. To the contrary, the Court clearly recognized in its March 1 Order that the settlement offers the Class substantial benefits beyond the creation of the common fund. The Court also recognized, however, that these benefits are contingent; a class member must qualify for a particular benefit before receiving it. Thus, for instance, benefits under the Valve Fracture Mechanism are payable to a class member only after he or she has suffered a total valve fracture,[10] while the benefits related to valve replacement surgery (i.e. "$38,000.00 for Miscellaneous Expenses", "Temporary Loss of Income", "Permanent Loss of Income" and "Alternative Payment for Death or Permanent Total Disability"),[11] are pay-

---

8. Contrary to Counsel's assertion, the Court was not without a basis for suggesting that the Class is declining at a rapid rate. Counsel's attention is directed to the following exchange between the Court and J. Kermit Smith, Chairman of the Supervisory Panel, at the hearing of September 14, 1995:

> MR. J. KERMIT SMITH: ... Now, you ask for statistics, sir. My understanding of this is, they're [sic] ... approximately 87,000 valves made by Shiley during this period of time.... We're assuming they're [sic] about 42,000 of those people still alive.
> THE COURT: Forty-two?
> MR. J. KERMIT SMITH: *Yes, sir, 42,000. I'm also informed they die at the rate of about 5,000 a year. That may or may not be a hundred percent true, but that's a statistic ... we've been given by all parties....*
>
> \* \* \* \* \* \*
>
> *Now, under the Supervisory Panel—and it is just a fact of life, sir— ... we anticipate a minimum of four years, because we're not going to have many patients to save after four years....*
> THE COURT: If my addition or subtraction is correct, there are approximately 37,000 people who are now using these valves.

> MR. J. KERMIT SMITH: That's right, sir ... (emphasis added).

Transcript of September 14, 1995 Hearing on Applications for Attorneys' Fees, at 119–124.

9. The only specific support offered by Counsel for their $500 million valuation of the settlement is the fact that "Pfizer carries a contingent liability reserve of $500,000.00 for *Bowling*." Motion, at 4, n. 3. This fact is not probative evidence of the value of the settlement. A company may create a reserve of a particular size for a host of accounting and business reasons that are separate and apart from the actual value of the liability.

10. *See* Settlement Agreement, ¶¶ 3.7, 7.

11. Although the settlement agreement is concededly unclear as to how these benefits are funded, the defendants have assured the Court in their most recent memorandum that the settlement has been interpreted as requiring them to pay these benefits directly out of their pocket, rather than through the Patient Benefit Fund. Other than noting that its interpretation of the settlement agreement would have been greatly facilitated by the defendants' meaningful partic-

able only after a class member qualifies for valve replacement surgery and satisfies the requirements for a particular benefit.[12] These benefits will, moreover, be paid out over a period of many years as class members qualify for them. Consequently, placing a total value on these benefits is virtually impossible and is one of the reasons, as set forth below, that the Court deferred payment of a portion of Counsel's total award until all parties get a better idea of the number of claims actually made for these benefits, the benefits paid out on these claims and the amount of work that Counsel have to do in seeing that these claims are paid under the settlement.

## II. *Counsel's Award of $10.25 Million*

■ With respect to the Court's formulation of their award for fees incurred to date, Counsel contend that $10.25 million does not reflect the high caliber of their work in this case, the difficulty of the negotiations leading to the settlement or the fact that they have carried the costs of their legal services and expenses for a number of years. Counsel also point out that the award equals only slightly more than the 1996 Supervisory Panel budget and is less than the total value of the last 10 valve fracture claims negotiated on behalf of class members.

Counsel's comparison of their award to the 1996 Supervisory Panel budget and the value of the ten most recent valve fracture claims negotiated on behalf of class members is completely irrelevant; it offers absolutely no insight into the relative value of their award. If it is context which Counsel seek for their

award, Counsel would do well to remember that the value of their services on an hourly basis is, at the very most, only $4,234,-542.94.[13] It should be noted that this figure reflects every hour claimed by Class and Special Counsel, including Class Counsel's 8,410.25 hours in "staff" time and all of Special Counsel Johnson's hours, dating back to 1987, for services he rendered in other cases against the defendants. The figure is also based upon Counsel's claimed hourly rates and includes, quite generously, a fee allowance of $50,000.00 for Special Counsel Magaña's fees although Mr. Magaña did not bother to submit time records.

Having pored over Counsel's fee application and supplements, the Court can assure Counsel that under any sort of rigorous lodestar analysis, a significant portion of their claimed hours and billing rates would be seriously questioned.[14] The Court clearly gave Counsel the benefit of the doubt in accepting their fee application at face value, and to say that $4,234,542.94 is a generous valuation of their services on an hourly basis is to put it mildly.

Counsel's award of $10.25 million exceeds the value of their services on an hourly basis by more than $6 million and implies a multiplier of well over two. In this context, it could not be any clearer that the Court did indeed consider the full scope of benefits offered by the settlement to the Class, the contingency undertaken by Counsel, the quality of Counsel's legal work and the delay in the payment of Counsel's fees. Little else would explain an award of $10.25 million for services that are worth, under the most generous of assumptions, only $4.24 million on

___

ipation in the fee application process prior to Counsel's motion to reconsider, the Court has no reason to question this representation; thus, these benefits are part of the "open-ended" benefits available under the settlement.

Defendants' payment of the actual *medical expenses* associated with a class member's valve replacement surgery, on the other hand, clearly is not one of these open-ended benefits, as Counsel contend. The settlement agreement clearly permits the defendants to pay these expenses directly out of the Patient Benefit Fund. *Id.* ¶ 5.3.3. Only after the defendants have paid all $75 million into the Fund, and if class members continue to qualify for valve replacement surgery at that time, will the defendants be required to

pay these expenses from a source other than the Patient Benefit Fund. *See Id.* ¶¶ 5.2.3, 5.3.2.

12. *See* Settlement Agreement, ¶¶ 5.6.1. 5.6.2, 5.6.3.

13. This figure is exclusive of Counsel's $710,-479.48 in claimed expenses.

14. Class Counsel's 8,410.25 hours in "staff" time, for instance, well may not be compensable at all and certainly would not be billable at the rates claimed in the application. Taking Class Counsel's staff charges for Mr. Comstock as but one specific example, charging $25.00 per hour for his work in copying and delivering documents is clearly exorbitant.

an hourly basis. Counsel have absolutely no basis for being discontent with their present award and, indeed, should consider themselves fortunate that the Court did not follow Public Citizen's request and base their award upon a lodestar analysis.

Finally, as to the nature of Counsel's work, the Court has little doubt that the negotiations leading up to the settlement were "extremely adversarial". It is, however, exceedingly clear to any experienced observer that this case went into a "settlement mode" early in the proceedings and was settled long before it ever came close to a trial posture. Thus, the nature of Counsel's work in this case clearly does not justify a larger award.

### III. *Counsel's Future Fee Awards*

█ Counsel assail the procedure adopted by the Court for the future award of fees and expenses on a number of grounds. Counsel initially assert that "the 10% cap placed upon future fee and expense awards carries an extremely arbitrary element, and the class is prejudiced thereby, for Class Counsel and Special Counsel are unwillingly forced to budget their time in order to insure their continued viability." Motion, at 10. In support of this assertion, Counsel first contend that 10% of the defendants' $6.25 million annual payments into the Patient Benefit Fund will simply be insufficient to cover their fees in a given year. Counsel also contend that, because the defendants may, under certain circumstances, be required to accelerate their payments into the Patient Benefit Fund, there may be years when the defendants make extraordinarily large payments and other years when they make no payments or only partial payments into the Fund. Thus, according to Counsel, the money available from defendants' payment into the Fund in a given year may not match the fees which Counsel incur in that year. Finally, Counsel assert that the Court has no basis for its voiced concern "that Counsel will not vigorously protect the best interests of the

class throughout the entirety of the [life of the settlement]". *Id.* at 12.

Counsel's suggestion that they will be required, in effect, to ration the services that they render to the Class is certainly not consistent with Class Counsel's representations to the Court at the September 14, 1995 hearing. At the hearing, Class Counsel was adamant that he would, regardless of the circumstances, provide class members with whatever services they might need during the life of this settlement.

Furthermore, Counsel have completely misconstrued the Court's concern with respect to their future representation of the Class. The Court has never suggested that Counsel would disregard their duty to the Class. What the Court has said is that circumstances change: law firms dissolve, lawyers retire and lawyers expire. These uncertainties advise against paying lawyers for services which they have yet to render in a civil matter of this sort. As the Court indicated at the hearing, in criminal defense work and certain marital cases, attorneys are frequently (and understandably) paid in full before their services have been fully rendered. Likewise, in structured settlements of personal injury cases (where future payments are definitively set), the plaintiff's attorney may well be paid out of the initial payment (or payments) under the settlement. But, in a class action settlement of this magnitude and complexity, where both the value of the payments under the settlement and Counsel's future legal services are impossible to predict, it is simply not appropriate for this Court to pay Counsel for services which they may or may not render in the future.

Turning to Counsel's specific criticisms, the Court is unmoved by Counsel's protestations that the 10% cap on their future fees will not provide them with adequate compensation for their future work. Again, on an hourly basis, the value of the services that Counsel rendered from the inception of this case in April of 1991 through August of 1995 is less than $4.24 million.[15] During this more

---

**15.** The value is less, of course, because Special Counsel's Johnson's claimed hours from 1987 through 1991 were obviously not rendered in this case. Thus, while it is arguable that these hours could be compensable on some sort of "setting the table for the settlement" theory, *see e.g., Gottlieb v. Barry,* 43 F.3d 474, 489 (10th Cir. 1994), they clearly do not represent work done in this case.

than four-year period, Counsel initiated this action, settled the case after "extremely adversarial" negotiations, gained approval of the settlement and certification of the Class, defended numerous appeals and began implementation of the settlement. All of this for less than $4.24 million in hourly fees, yet Counsel contend that up to $6.25 million (10% of the $62.5 million which will be paid into the Patient Benefit Fund), *plus expenses,* will be insufficient compensation for the future services which they expect to render in this case. This contention simply defies credibility.

As for the timing and size of the defendants' payments into the Fund, the Court would note that the judge presiding over this case possesses the inherent power, as well as the continuing jurisdiction provided for in the settlement and the Court's judgment certifying the settlement class and approving the settlement,[16] to make any necessary adjustments in the procedures established by the Court so as to assure that Counsel receive fair and reasonable compensation for the services that they render. The then presiding judge's inherent power would clearly include the power to, among other things, raise the 10% cap in the highly unlikely event that Counsel's legal services for a particular period justify such action or urge the defendants to pay additional amounts into the Patient Benefit Fund in the highly unlikely circumstance that additional funds are necessary to pay Counsel's fees.[17]

Counsel's criticism of the Court's procedure for future fee awards is indeed ironic in light of Class Counsel's previous "proposal" to the Court on this issue. At the conclusion of the September 14, 1995 hearing, the Court requested submissions from Counsel suggesting an appropriate procedure for paying Counsel for their future work under the settlement. Class Counsel responded with a brief letter indicating that he and his co-counsel preferred to receive $33 million up front and in full, but would be agreeable to

an immediate payment of $18 million and receipt of the remaining $15 million through guaranteed payments over the next five years, regardless of the nature or amount of future work actually performed. This proposal was patently unacceptable and essentially non-responsive to the Court's request, and Counsel still do not offer the Court any solutions to the problems they perceive with the Court's procedure, stating in their current motion only that "[t]here are alternatives available for consideration." Motion, at 10.

The procedure adopted by the Court, in contrast, assures that Counsel are not paid until they have rendered their services, and places the Court in the best possible position for making an award that fairly compensates Counsel and assures that the Class only pays for what it gets. As Counsel make their annual applications to the Court to receive up to 10% of the defendants' payments into the Patient Benefit Fund, the Court will know the precise nature and quantity of the services rendered by Counsel, as well as the extent of the future benefit derived by the Class from the settlement. Thus, the Court's procedure ensures that Counsel are paid for the work that they do and the benefit that they render at the time that they actually do the work and render the benefit.

## IV. *Public Citizen's Role in this Case*

■ Counsel's vitriolic attack on Public Citizen and the role that it played in this case is as inappropriate and out of place in these proceedings as it is irrelevant to the issues before the Court.[18] The Court did not, as Counsel suggest, simply defer to or adopt Public Citizen's analysis of the settlement and fee applications before the Court. The Court did, however, find Public Citizen's thoughtful opposition to the fee applications before the Court to be of assistance. Faced

---

16. *See* Settlement Agreement, ¶ 10.2; Judgment Certifying Settlement Class and Approving Class Settlement (doc. 255).

17. *See* Settlement Agreement, ¶ 5.1.

18. Special Counsel Capretz apparently takes a different view of Public Citizen's role in this case. *See* Response of Special Counsel James T. Capretz to March 21, 1996 Response of Public Citizen to Motion for Reconsideration (doc. 835), at 2–3.

with Counsel's frequent exaggerations,[19] and a total lack of adversarial participation by the defendants on the question of attorneys' fees, Public Citizen has been the only party to provide the Court with a counterpoint in these proceedings. Thus, regardless of the nature of their participation in other aspects of this case, their participation on the issue of attorneys' fees was professional, thoughtful and beneficial to the Class.

## V.  The Effect of Counsel's Award Upon the Expeditious Settlement of Class Actions

In a crescendo of hyperbole, Counsel assert that their fee award is so low that it sounds "a death knell to the expeditious resolution of 'complex litigation'". Motion at 9. This assertion is utterly absurd. Counsel have been awarded $10.25 million plus expenses for work performed to date, as well as the right to apply for reasonable fees and expenses related to the future services they render to the Class. This award most assuredly provides ample incentive to other highly capable and ingenious attorneys to take whatever action is appropriate in bringing and handling complex, mass-tort litigation. One has only to peruse the myriad articles in the popular media and professional journals to know that there is no shortage of attorneys who stand ready to take up the cause of those who have been injured by an environmental disaster, a defective product or the like. In this Judge's experience, gained through service on the Judicial Panel on Multidistrict Litigation and 23 years on the bench, there is an abundance of industrious lawyers willing, even anxious, to aggressively pursue mass tortfeasors. Counsel's assertion that their award is so small that attorneys will no longer be willing to resolve these sorts of cases in a manner that is in the best interests of their clients is insulting to the bar at large and to this Court. It gives credence to the growing perception of greed in the legal profession.

## VI.  Award of Expenses

■ Counsel assert that the Court's award of $476,938.06 in expenses overlooks the complete expense submissions of Special Counsel Wolfson, Magaña and Capretz. Additionally, Special Counsel Johnson has submitted an affidavit in which he has recalculated and clarified his expenses in accordance with the Court's determination that only those expenses reasonably and necessarily incurred in this case are compensable. In his original application, Mr. Johnson, perhaps assuming that he would receive a full award of expenses, did not clearly set forth which of his expenses were incurred in this case and which were incurred in previous cases. In his affidavit, Mr. Johnson sets forth that he and his former law firms incurred a total of $110,394.84 in expenses related solely to this case. He further asserts that the $8,309.52 in expenses of his English co-counsel, Alexander Harris & Co., relate solely to this case and include the costs of travel to appear twice before the Court in support of the settlement. Accordingly, he requests that the Court make a further award of expenses on his behalf in the amount of $78,455.83.[20]

The Court has no interest in denying Counsel compensation for any expenses which they reasonably and necessarily incurred in this case. Counsel have not, however, sustained their burden of showing that Special Counsel Wolfson, Magaña and Capretz are entitled to a further award of expenses. Mr. Wolfson's most recent submission is completely inadequate: it does not indicate whether the figure sought is in Australian or American dollars and does not indicate whether it is in addition to, or inclusive of, Mr. Wolfson's previous expense requests. As for Messrs. Magaña and Capretz, the Court has been unable to locate any document suggesting that they are entitled to a further award of expenses. The Court

---

19. An example of Counsel's exaggeration is the assertion that "Class and Special Counsels' services, through mid-August, 1995, exceeded twenty-eight thousand (28,000) hours." Motion, at 3. This statement is grossly misleading in that the figure of 28,000 includes thousands of paralegal, law clerk and "staff" hours.

20. The Court originally awarded Special Counsel Johnson $40,248.53 in expenses. Thus, he seeks an additional award of $78,455.83 in expenses, which would bring his total award up to $118,-704.36.

will, therefore, deny Messrs. Wolfson's, Magaña's and Capretz's request for a further award of expenses. The Court will, however, permit them to file a limited supplemental request within seven days setting forth in detail the expenses to which they claim entitlement but have not been awarded. With respect to Mr. Wolfson, Counsel shall set forth his expenses in *United States currency* and shall state the conversion rate used. Counsel shall also file a copy of any request so submitted with Public Citizen, which shall have seven days from receipt to respond.

As for Special Counsel Johnson, the Court has compared his affidavit with his previous submissions, and concludes that Mr. Johnson has satisfactorily clarified that he reasonably and necessarily incurred expenses totaling $107,283.11 in this case, while his English co-counsel reasonably and necessarily incurred $8,309.52. Accordingly, the Court will increase Counsel's previous expense award by a further $75,344.10 to reflect a full award of expenses to Mr. Johnson and his English co-counsel.

### CONCLUSION

Based upon the foregoing,

**IT IS HEREBY ORDERED** that Class and Special Counsel's motion for reconsideration, alteration and amendment be and is granted in part and denied in part. The Special Masters/Trustees appointed to administer the settlement in this case shall immediately pay, in addition to the amounts previously awarded by the Court in its Order of March 1, 1996, as amended March 12, 1996, to Class and Special Counsel $75,344.10 from the Medical and Psychological, Patient Benefit and Spousal Compensation Funds as further reimbursement for Counsel's expenses. Payment from these funds shall be on a *pro rata* basis.

**IT IS FURTHER ORDERED** that all other relief sought in Counsel's Motion for Reconsideration, Alteration and Amendment of the Court's Memorandum and Order on Applications for Attorneys' Fees and Expenses be and is denied; provided, however, that Counsel may file within seven days of the date of entry of this Order, a limited supplemental request for reimbursement of expenses incurred by Special Counsel Wolfson, Magaña and Capretz. A copy of any such request shall be served upon Public Citizen, which shall have seven days from the date of its receipt to respond to the request.