**GREAT NECK CAPITAL APPRECIATION INVESTMENT PARTNERSHIP, L.P., C. William Carter and Norman Ellison, Plaintiffs,**

v.

**PRICEWATERHOUSECOOPERS, L.L.P., Defendant.**

**In re Harnischfeger Industries, Inc., Securities Litigation.**

**No. 99–C–0598.**

United States District Court, E.D. Wisconsin.

Nov. 6, 2002.

---

Frederick W. Gerkens, III, Jeffrey M. Haber, Robert I. Harwood, Wechsler Harwood, LLP, New York City, Gregory W. Lyons, O'Neil, Cannon & Hollman, Milwaukee, WI, for Great Neck Capital Appreciation Inv. Partnership, L.P.

Alezander Shaknes, Michael W. Schwartz, Wachtell, Lipton, Rosen & Katz, New York City, John A. Busch, Jonathan H. Margolies, Michael Best & Friedrich, Milwaukee, WI, for Harnischfeger Industries, Inc., Jeffrey T. Grade, John N. Hanson, Francis M. Corby, Jr., and Mark E. Readinger.

Gerald S. Walsh, Peter J. Walsh, Walsh & Keating, Wauwatosa, WI, for John G. Kling.

### DECISION AND ORDER

ADELMAN, District Judge.

The parties in this securities fraud class action have negotiated a settlement and ask me approve it. In order to do so, I must address four issues: (1) certification of the class; (2) the adequacy of the settlement; (3) plaintiffs' application for attorney's fees and costs; and (4) the objector's application for attorney's fees and costs. First, however, I will briefly describe the context in which these issues arise.

## I. PROCEDURAL AND FACTUAL BACKGROUND

In 1998, plaintiff investors commenced this action on behalf of themselves and others who purchased the stock of defendant Harnischfeger Industries ("Harnischfeger") during the period November 26, 1997 through August 26, 1998 ("the class period"). Harnischfeger was a holding company for subsidiaries engaged in the manufacture of machinery and is now known as Joy Global, Inc. Plaintiffs alleged that Harnischfeger and several individual defendants who were part of Harnischfeger management issued materially false and misleading financial statements to the investing public regarding Harnischfeger's financial situation and business prospects. These statements covered the year ending 1997 and some of the quarters of 1998, and allegedly caused the price of Harnischfeger stock to be artificially inflated. Plaintiffs alleged that defendants committed fraud on the market in violation of § 10(b) the Securities Exchange Act of 1934, 15 U.S.C. § 78(b), and Rule 10 b–5, 17 C.F.R. § 240.10b–5.

Harnischfeger's problems resulted from cost overruns arising out of contracts between the Beloit Company, a Harnischfeger subsidiary, and Asia Pulp and Paper Company to construct what were known as fine paper machines. These machines were the size of buildings, and construction took place in remote jungles in Indonesia. Harnischfeger had not previously been involved in a similar project, and apparently lacked the internal controls necessary to ascertain the true cost of fulfilling the contracts. Thus, the contracts very quickly went over budget. Plaintiffs alleged that Harnischfeger improperly recognized revenue from the Asian contracts and failed to take into account expenses and, thus overstated profits dramatically.

Harnischfeger was required to restate its financial statements to account for something in excess of $150 million of previously omit-

ted costs. As a result, the value of its stock plummeted. During the class period, the stock traded as high as $39 a share; but by the end of the class period, after all the information was in the marketplace, the stock had declined to $17 per share.

In the wake of Harnischfeger's disclosures, three lawsuits were filed. I consolidated the suits and appointed the Great Neck Capital Appreciation Investment Partnership, L.P., and C. William Carter as lead plaintiffs and Berman, DeValerio & Pease, LLP, and Weschler, Harwood, Halebian & Feffer, LLP, as co-lead counsel. Lead plaintiffs then filed a consolidated amended class action complaint. The parties then engaged in discovery and retained damage experts. They also entered into settlement discussions but were unable to reach a resolution.

In May 1999, plaintiffs filed a companion complaint against defendant PricewaterhouseseCoopers, LLP ("PwC"), Harnischfeger's outside auditor. Plaintiffs alleged, among other things, that PwC falsely stated that its audit of Harnischfeger was conducted in accordance with Generally Accepted Auditing Standards, and that the 1997 financial statements presenting the company's financial condition were in conformity with Generally Accepted Accounting Principles.

The proceedings were suspended for a time when Harnischfeger filed for bankruptcy protection in June 1999 in Delaware. Plaintiffs' counsel appeared at hearings in the bankruptcy action and argued that the automatic stay of pending litigation resulting from the bankruptcy petition should be lifted. On May 2, 2000, the bankruptcy court lifted the stay and allowed the present case to go forward.

Subsequently, PwC moved to dismiss the complaint on a variety of grounds including that it failed to meet the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b). Plaintiffs responded and, after consideration, I issued a decision granting the motion in part and denying it in part. *Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*, 137 F.Supp.2d 1114 (E.D.Wis.2001).

Plaintiffs and the Harnischfeger defendants then renewed their settlement discussions and ultimately agreed to participate in mediation. They retained Eric Green, a professional mediator, and conducted a two-day mediation in New York City. On May 2, 2001, plaintiffs and the Harnischfeger defendants reached an agreement. Subsequently plaintiffs and PwC also reached an agreement. Under the proposed settlement, Harnischfeger, the individual defendants and their liability insurer deposited $9,150,000 into an interest bearing escrow account for the benefit of the class, and PwC deposited an additional $1 million into the account.

On October 19, 2001, I certified the class and granted preliminary approval of the settlement. I also scheduled a fairness hearing, directed that notice be disseminated to the class, and barred class members from commencing an action asserting any of the settled claims.

Class counsel arranged for notice to be mailed to potential class members, and about 14,000 notices were mailed. Notice of the proposed settlement was also published in the *Wall Street Journal*. Two shareholders asked to be excluded from the class.

One individual, John Kling, a long time Harnischfeger employee ("the objector"), objected to the settlement and moved to intervene, which motion was granted. Kling became aware of the proposed settlement as the result of an article that appeared in the *Milwaukee Journal–Sentinel* on October 22, 2001. He was interested in the proposed settlement because, as an officer of Local 1114 of the United Steelworkers of America, which represents many Harnischfeger employees, he had previously been authorized by a vote of the union membership to explore the viability of a lawsuit against the fiduciaries of the Harnischfeger Industries Employees Savings Plan ("Plan") for large losses that the fiduciaries allegedly caused in the 1997–1999 period.

Like many other Harnischfeger employees, Kling was a participant in the Plan, a qualified 401(k) plan. Harnischfeger had allegedly strongly encouraged employees to exercise an investment option offered by the Plan, that of purchasing company stock

through an undiversified fund, the Harnischfeger Common Stock Fund ("Fund"). The Fund consisted exclusively of Harnischfeger stock and a nominal amount of cash. About 970 Harnischfeger employees, including Kling, invested in the Fund during the class period.

Notice of the proposed settlement was sent to the trustee of the Plan, Fidelity Management Trust Company ("Fidelity"), but not to Kling or other participants in the Plan who had invested in the Fund. Neither Fidelity nor anyone else associated with the Plan notified the Plan participants of the proposed settlement.

Kling and his counsel determined that a lawsuit under the Employees Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, against Fidelity and members of two Harnischfeger Industries Committees, the Pension Committee and the Investment Committee, which were involved in administering and advising the Plan, was warranted. Thus, Kling, as a representative of the Plan and its participants and beneficiaries, commenced an action against Fidelity and certain Committee members alleging that they had breached their fiduciary duty under ERISA by keeping the Fund open for employee investment after they knew or should have known that it was imprudent to do so. Kling stated that the purpose of the suit was to vindicate the rights of Harnischfeger employees who lost their retirement savings in the Fund because of the misconduct of the fiduciaries. He brought the action in federal court in Boston, Fidelity's headquarters, and alleged damages in excess of $31 million.

On January 4, 2002, I held a fairness hearing at which the settling parties asked me to approve the proposed settlement. However, Kling, through counsel, argued that the proposed settlement was unfair because even though plaintiffs were not participants in the Plan and had not asserted claims under ERISA, the language of the proposed release was so broad that it would likely extinguish the ERISA claims that he had asserted in the Boston lawsuit. He argued that unless the release was modified to exclude the ERISA claims, the proposed settlement was unfair and should not be approved. Kling stated that the ERISA claims differed from the securities fraud claims because they were based on different legal theories, covered different time periods, and involved different measures and amounts of damages. He also made clear that he did not seek a double recovery.

The settling parties did not dispute Kling's assertion that the language of the proposed release was very broad, and that it probably would extinguish the Plan participants' ERISA claims. However, both plaintiffs and defendants asserted that the settlement could not be modified and should be approved.

Kling's objection and the settling parties' responses raised a number of legal issues. The fundamental question was whether a settlement of a securities fraud class action which extinguished without compensation apparently non-frivolous ERISA claims asserted by company employees in a separate lawsuit could be approved as fair, adequate and reasonable over the employees' objection. However, the debate also touched on other issues such as whether the Plan participants were class members and, if so, whether they should be required to opt out of the present case in order to bring their ERISA claims. These and other issues precipitated extensive debate between the parties.

During a telephone conference on June 24, 2002, I advised the parties that I was inclined to the view that the proposed settlement was unfair if its effect would be to extinguish the Plan participants' ERISA claims without compensation, and that it also appeared to be unfair to require Plan participants to give up their right to participate in the settlement as a condition of asserting ERISA claims. At that point, the settling parties stated for the first time that they would be willing to negotiate with the objector to narrow the scope of the release to exclude the ERISA claims.

The parties commenced negotiations and, on September 9, 2002, notified me that they had reached an agreement which was described as follows:

> After much negotiation, counsel for plaintiffs, defendants and the Objector have

agreed to the terms of a revised proposed form of Order and Final Judgment (which provides, *inter alia,* for the exclusion of the ERISA claims from the definition of "released claims"), as well as a separate stipulation and order allowing for the filing of a late claim by a designee of the pension plan (the "Stipulation and Order"). This compromise fully addresses the issues raised by the scope of the release.

(Letter from Pls' Liaison Counsel to Court of 9/9/02.)

I now turn to the issues presented by the proposed settlement as modified.

## II. CLASS CERTIFICATION

■ Because class actions depart from " 'the usual rule that litigation is conducted by and on behalf of the individual named parties only,' " a court may certify a class only after undertaking a rigorous analysis to determine whether a party seeking class certification has satisfied the requirements of Fed.R.Civ.P. 23. *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) (i.e., numerosity, commonality, typicality, and adequacy of representation) is met and also of demonstrating the appropriateness of a class action under one of the Rule 23(b) subparts. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620–21, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ Provided that the Rule 23 framework is followed, the decision to certify a class resides in the court's sound discretion. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). In exercising such discretion I keep in mind that the Seventh Circuit has stated that:

> Rule 23 must be liberally interpreted. Its policy is to favor maintenance of class actions. This policy operates just as surely in cases where securities fraud is charged. It is especially strong in instances where denial of class status would effectively terminate further litigation of the securities fraud claims.

*King v. Kan. City Southern Indus., Inc.,* 519 F.2d 20, 25–26 (7th Cir.1975) (citations omitted).

### A. Rule 23(a) Requirements

■ The first of the four criteria identified in Rule 23(a) is numerosity. The class must be "so numerous that joinder of all numbers is impracticable." Fed.R.Civ.P. 23(a)(1). To be impracticable, joinder need not be impossible but only difficult or inconvenient. *Adver. Specialty Nat'l Ass'n v. FTC,* 238 F.2d 108, 119 (1st Cir.1956). Although the number of members in a proposed class is often the overriding factor in a court's assessment of the impracticability of joinder, other factors may also be considered. *See Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986). In securities cases like this one, where many shares are traded on national stock exchanges, class members are usually so geographically dispersed and numerous that the impracticability of the joinder requirement is easily satisfied. *Id.* In the present case, during the class period more than forty-seven million shares of Harnischfeger stock were outstanding. Also, thousands of notices were mailed to potential class members. Thus Rule 23(a)'s numerosity requirement is met.

■ In order to certify a class under Rule 23(a)(2), I must also find that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The commonality requirement is ordinarily satisfied where there is a "common nucleus of operative fact." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). The commonality requirement is easily met in cases where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties even when damages vary. Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 22.14 (3d ed.1992); *see, e.g., Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 598 (2d Cir.1986); *Resnick v. Am. Dental Ass'n,* 90 F.R.D. 530, 538 (N.D.Ill.1981). In the present case, there are common questions of law and fact, including, among others, whether defendants made material misrepresentations to the investing public and, if so, whether plaintiffs were damaged as a

result thereof. Accordingly, plaintiffs satisfy the commonality requirement.

■■■ Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Generally, a class representative is considered "typical" when his or her claims arise from the same practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983). In the present case, plaintiffs meet this standard. Plaintiffs purchased Harnischfeger common stock during the class period and their claims are based on the same alleged unlawful conduct as those of members of the class sought to be represented. Plaintiffs assert that they and the class members were injured when they purchased Harnischfeger common stock during the class period at artificially inflated prices caused by defendants' conduct. *See Trattner v. Am. Fletcher Mortgage Investors*, 74 F.R.D. 352, 356 (S.D.Ind.1976) (finding typicality when named plaintiffs' claims were based on same legal and remedial theories as claims of class members).

■■■ Finally, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Adequate representation is constitutionally required to afford due process. *Fisher Bros. v. Mueller Brass Co.*, 102 F.R.D. 570, 576 (E.D.Pa.1984). The two key factors relevant to the determination of adequacy are an absence of potential conflict between the named plaintiff and absent class members, and an assurance of vigorous prosecution on behalf of the class. *See Fry v. UAL Corp.*, 136 F.R.D. 626, 634 (N.D.Ill.1991). Thus, for a class to be certified, both the named plaintiff and class counsel must be able to serve the interests of the entire class. *Amchem Prods., Inc.*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231.

■■■ Before his concerns were resolved, the objector raised serious questions as to whether the named plaintiffs and class counsel were adequately representing the interests of the participants and beneficiaries of the Plan. He argued that there was a conflict between the named plaintiffs, who did not possess and had no interest in preserving ERISA claims, and Plan participants, who wished to assert such claims. He also argued that by agreeing to extinguish such claims, class counsel was not providing the Plan participants with adequate representation. Because the settling parties agreed to modify the release, I need not address these issues. At present, the named plaintiffs have no interests antagonistic to the class that they seek to represent. Further, class counsel has demonstrated a commitment to the vigorous prosecution of this action, is experienced in federal securities litigation and capable of protecting the interests of the class. Accordingly, the requirement of Rule 23(a)(4) is satisfied.

## B. Rule 23(b)(3) Requirement

In addition to satisfying the Rule 23(a) criteria, a plaintiff who is seeking to represent a class in an action under the federal securities laws must meet one of the requirements of Rule 23(b). Securities class actions that primarily seek monetary damages are generally upheld under subsection (b)(3). *See Smith v. Shawnee Library Sys.*, 60 F.3d 317, 321 (7th Cir.1995). This subsection requires that "[t]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

■■■ The primary consideration in assessing predominance is the proof necessary to establish the class members' claims under the applicable substantive law. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir.1993). Generally, "[i]n fraud on the market cases, common questions of law and fact predominate over individual questions." *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 171 (D.Mass.1989). In the present case, the objector raised questions as to whether common issues of law and fact predominated over individual issues. However, the objection having been resolved,

I am persuaded that common issues of law and fact predominate over any individual or non-common issues.

With respect to Rule 23(b)(3)'s requirement that a class action be "superior" to other available methods for adjudicating the controversy, courts have recognized the superiority of a class action in securities fraud cases. Such cases generally involve numerous defrauded investors whose claims are individually not large enough to make separate actions economically feasible. For example, in *Guarantee Insurance Agency Co. v. Mid–Continental Realty Corp.*, 57 F.R.D. 555, 566 (N.D.Ill.1972), the court stated:

> Management of the class action presents no serious difficulties. The fact the individual purchasers may not have sustained sufficient damage to justify the cost of individual suits clearly tips the balance in favor of maintaining this suit as a class action. Vindication of rights under the federal securities laws would seldom be accomplished were it not for the class action device.

The present case is a typical securities fraud class action claim, thus the "superiority" requirement of Rule 23(b)(3) is also met.

## III. ADEQUACY OF SETTLEMENT

■ Fed.R.Civ.P. 23(e) requires court approval of any settlement that effects the dismissal of a class action. In order to approve a settlement, a district court must first determine that the settlement is fair, adequate and reasonable, and not a product of collusion. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir.2002). In making this determination I must exercise the highest degree of vigilance because in the settlement phase of a class action, a district judge is a fiduciary of the class, subject to the high duty of care that the law requires of fiduciaries. *Id.* at 279–280.

■ Nevertheless, the settlement of class action litigation is favored. *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir.1996). Courts are not to substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir.1998). In order to determine whether a settlement is fair, adequate, and reasonable, courts should consider such factors as: (1) the strength of the plaintiffs' case balanced against the settlement offer; (2) the defendants' ability to pay; (3) the burdens of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion; (6) the opinion of competent counsel; and (7) the stage of the proceedings and the amount of discovery that has been completed. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985). The first listed factor is the most important. *Id.*

■ In the present case, the pertinent factors weigh in favor of approval. Plaintiffs have negotiated a substantial settlement offer from defendants. If the settlement was disapproved and the case tried, plaintiffs would face substantial risks. The factual and legal issues in the case are not simple, and a jury would have to evaluate conflicting evidence on such issues as scienter, materiality, causation and damages, as well as conflicting expert testimony. *See In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 744–45 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir.1986) (pointing out that it is virtually impossible to predict which testimony would be credited). Defendants have argued that they did not act recklessly or with an intent to deceive. There is a considerable risk that they could prevail before a jury on these issues, in which case plaintiffs would get nothing. Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted. *See Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D. 337, 347 (N.D.Tex.1976).

■ The value of the settlement, more than $10 million, is substantial. The determination of whether a settlement is reasonable is not susceptible to mathematical equation yielding a particularized sum. *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). The settlement amount appears to represent a substantial portion of the damages that plaintiffs would recover at trial if they were successful. The mere possibility that the class might receive more if the case

were fully litigated is not a good reason for disapproving the settlement. *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir.1992). If the case were fully litigated there is also a possibility that plaintiffs could receive less. Defendants would assert that the losses were due to market, industry and general economic conditions rather than wrongful conduct. Therefore, the act of assessing the strengths of plaintiffs' case against the settlement offer weighs in favor of approval of the settlement.

The other factors relevant to the fairness of the settlement also weigh in favor of approval. With respect to Joy Global's financial condition, I note that the company recently emerged from bankruptcy. Further, plaintiffs face the risk that the source of the recovery, the directors' and officers' liability insurance once available to the individual defendants, could disappear if plaintiffs proved that the individual defendants' acts were intentional rather than reckless or negligent.

Additionally, the burdens of further litigation of the case would be substantial. As stated, the case involves complicated factual and legal issues. Given the prospects for a long and arduous trial and appeal process, settlement at this stage is beneficial to class members. *See In re First Commodity Corp. of Boston Customer Accounts Litig.*, 119 F.R.D. 301, 314 (D.Mass.1987).

 The response to the settlement from class members has been favorable. Only two shareholders have opted out, and the only objection to the settlement has been withdrawn as the result of the modification of the terms of the release. A favorable reception by the class is evidence of the fairness of a proposed settlement. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313–14 (3d Cir.1993).

 The sum of money that defendants will pay in settlement was arrived at as the result of arms-length negotiations by competent counsel. The negotiations with the Harnischfeger defendants took place over a two-day mediation session with an experienced mediator. The negotiations with defendant PwC took place over several telephone conferences. A strong presumption of fairness attaches to a settlement agreement when it is the result of this type of negotiation. *See Anderson v. Torrington Co.*, 755 F.Supp. 834, 838 (N.D.Ind.1991).

Plaintiffs' counsel have substantial experience in litigating federal class action securities cases. They represent that the settlement is fair and reasonable. The opinion of competent counsel weighs in favor of approval of a settlement. *Armstrong*, 616 F.2d at 325.

Finally, the state of the proceedings and the amount of discovery completed weigh in favor of the settlement. *See Isby*, 75 F.3d at 1199. Here, the settlement was reached after PwC's motion to dismiss had been decided and after merits discovery was well underway. Thus, plaintiffs' counsel's evaluation of the case was based on a reasonable amount of information.

 A plan of allocation of settlement proceeds in a class action must also be fair and reasonable. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir.1992). The proposed plan of allocation of the settlement fund in the present case meets this requirement. The plans provides that members of the class who submit acceptable proof of claim forms evidencing a loss in their transactions in Harnischfeger stock during the class period are entitled to a recovery. The plan is similar to those utilized in other securities class action cases and provides an equitable basis for distributing the fund to eligible class members.

## IV. PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS

 In the United States, parties to a lawsuit usually bear their own expenses, regardless of which party prevails. *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 562 (7th Cir.1994). However, there are exceptions to this principle including the so-called "common fund" or "equitable fund" doctrine. *Id.* Under this doctrine, when a case results in the creation of a common fund for the benefit of the plaintiff class, the plaintiffs' attorneys may petition the court to recover their fees out of the fund. *Id.* In such a case, the

defendant typically pays a specific sum into the court in exchange for a release of its liability. *Id.* The court then determines the amount of attorneys' fees that plaintiffs' counsel may recover from the fund.

█ The Supreme Court has made clear that private actions are an effective means of enforcing federal laws against securities fraud. *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). Moreover, under the PSLRA, plaintiffs' counsel are entitled to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6). The PSLRA does not specify what a "reasonable percentage" is. In order to determine what is reasonable, my task is to attempt to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time. *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718 (7th Cir.2001).

█ Put slightly differently, the measure of what fees and costs are reasonable is what an attorney would receive from a paying client in a similar case. *Cook v. Niedert,* 142 F.3d 1004, 1012 (7th Cir.1998). This standard obviates, at least to a certain extent, the need to assign a value to an attorney's work based on nothing more than a subjective judgment regarding that work. *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 408 (7th Cir.2000), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001). It gives a court a background against which to work by requiring the court to look to evidence regarding the sorts of fees and costs generated in analogous suits funded by paying clients. *Id.*[1]

There are several approaches to determining the hypothetical market price of attorneys fees in common fund class action cases, the most common being the percentage of fund and the lodestar approaches. Under the percentage of fund method, class counsel is awarded a fee equal to a specific percent-

age of the recovery as in a typical market-based contingency fee arrangement. Under the lodestar method, the number of hours expended by counsel is multiplied by the hourly rate normally charged for similar work by attorneys of like skill in the area and once this base or lodestar is established the final fee is determined by considering other less objective factors such as the risk of not prevailing in the lawsuit. *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977). The differences between the two methods (percentage and lodestar) have largely been reconciled in common fund cases because, in actual practice, courts have essentially concluded that proper use of both methods should lead to a fee of similar size. Alba Conte, *Attorney Fee Awards* § 2.06 (2d ed.1993).

The Seventh Circuit recognizes that there are advantages to utilizing the percentage of fund method in common fund cases including its relative objectivity and the fact that it is easily administered. However, the decision as to which method to use is within the discretion of the district court. *Florin,* 34 F.3d at 566. I note that courts increasingly use the percentage of fund approach after consideration of specified guidelines under the particular circumstances involved. *See Blum v. Stenson,* 465 U.S. 886, 901 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In the present case, I will use the percentage of fund method and in determining the appropriate percentage will consider several factors. These include the contingent nature of the case, the quality of services rendered, the benefits derived by the class, and the public service aspects of the case. *In re Cenco Inc. Sec. Litig.,* 519 F.Supp. 322, 325 (N.D.Ill. 1981). I will also consider how far the litigation proceeded prior to settlement. *Harman v. Lyphomed, Inc.,* 787 F.Supp. 772, 774 (N.D.Ill.1992).

Depending on the presence or absence of the above factors, courts have established different percentages. One court found that

---

1. Some courts have criticized the attempt to mimic the fee-paying market. *See, e.g., Gottlieb v. Wiles,* 150 F.R.D. 174, 180 (D.Colo.1993), *rev'd,* 43 F.3d 474 (10th Cir.1994) ("Not only is there no ready analogy in the contingency fee-

paying market to a class action securities case, the court's ability to make even a principled guess at a hypothetical market transaction between the class and class counsel is severely limited.")

the typical range of fees was between twenty percent and thirty percent. *Mashburn v. Nat'l Healthcare, Inc.*, 684 F.Supp. 679, 687–92 (M.D.Ala.1988). Others have said that the benchmark is twenty-five percent from which the award may be adjusted upward or downward. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir.1989). Yet other courts have found, based on an extensive examination of cases, that the benchmark is closer to thirty percent. *In re Activision Sec. Litig.*, 723 F.Supp. 1373, 1377 (N.D.Cal.1989). In some commercial litigation, the percentage is tapered depending on the size of the recovery. *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992) (the percentage "might be 33 percent of the first million, 25 percent of the next million, and so on down"); *see also Montgomery*, 231 F.3d at 409 (approving award of twenty-five percent).

▮ In the present case, plaintiffs' counsel request an award of attorneys' fees equal to thirty percent of the settlement, plus expenses, together with interest thereon at the same rate as earned by the settlement fund since the date of the deposit. The total amount of the settlement is $10,150,000, and the fee requested is $3,045,000. As previously indicated, plaintiffs' counsel achieved a good recovery for the class. Counsel is skilled in securities fraud class actions and used their expertise to the advantage of the class. The case presented a number of difficult issues and the risks of not prevailing were considerable. The litigation pursued by plaintiffs was also socially beneficial because a securities fraud class action is a mechanism for holding corporations accountable for wrongdoing. Finally, although the settlement was reached relatively early in the litigation (after PwC's motion to dismiss had been denied), class counsel put in a substantial amount of work. Thus, a fee in the range requested by class counsel is appropriate. I will determine the precise amount of the fee after discussing the objector's application for attorneys' fees, which is a complicating factor in the present case.

Plaintiffs' counsel also requests reimbursement of litigation expenses in the amount of $332,425.94. The paying arms-length market typically reimburses lawyers for expenses of the type as reflected in plaintiffs' counsels' documentation. *See Synthroid Mktg.*, 264 F.3d at 722; *Cont'l Ill.*, 962 F.2d at 570. Thus, this request will be approved.

▮ Finally, plaintiffs request incentive awards of $5,000 each for the named plaintiffs, Great Neck Capital Appreciation Investment Partnership L.P. and C. William Carter. Incentive awards are appropriate if necessary to induce an individual to become a named plaintiff in a suit. *Synthroid Mktg.*, 264 F.3d at 722. Plaintiffs' counsel asserts that the prospect of a modest incentive award was necessary to induce plaintiffs to participate. Further, the named plaintiffs were required to respond to discovery requests, produce documents, meet with counsel in preparation for their depositions and undergo depositions. Additionally, plaintiffs' counsel states that they continuously monitored the litigation and consulted with counsel throughout. Therefore, I will approve the requested incentive awards to the named plaintiffs.

## V. OBJECTOR'S APPLICATION FOR ATTORNEYS' FEES AND COSTS

### A. Legal Standard

In a class action settlement it is desirable to have as broad a range of participants as possible because of the risk of collusion over attorneys' fees and the terms of the settlement generally. *Reynolds*, 288 F.3d at 288. It is impossible for a class to select, retain or monitor its lawyers as an individual client would. *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002). Class counsel and defendants' counsel may reach a point where they are cooperating in an effort to consummate the settlement. Courts, too, are often inclined toward favoring the settlement, and the general atmosphere may become largely cooperative. *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 202 (3d Cir.2002) (Rosenn, J., concurring and dissenting). Thus, objectors serve as a highly useful vehicle for class members, for the court and for the public generally. From

conflicting points of view come clearer thinking. *Id.* Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service.

 Broad participation in a class action is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee. *Reynolds,* 288 F.3d at 288; *Gottlieb v. Barry,* 43 F.3d 474, 490–91 (10th Cir.1994); *Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527, 547 (5th Cir.1980); *White v. Auerbach,* 500 F.2d 822, 828 (2d Cir.1974). Therefore, " 'an attorney whose actions have conferred a benefit upon a given group or class of litigants may file a claim for reasonable compensation for his efforts.' " *In re Anchor Sec. Litig.,* No. CV–88–3024, 1991 WL 53651, at *1 (E.D.N.Y. Apr.8, 1991) (quoting *City of Detroit,* 560 F.2d at 1098). Faced with such a claim, the court should consider "whether the efforts of objectors' counsel 'improved' the settlement, 'assisted the court,' and/or 'enhanced the recovery' in any discernible fashion." *Id.* (quoting *White,* 500 F.2d at 828); *see also Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1156 (8th Cir.1999) (stating that an award of fees is proper where a lawyer provided a benefit or enhanced the adversarial process); *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 855 (10th Cir.1993) (awarding fees to objecting counsel because the court found that the objection was valid and conferred a net benefit on the class); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 359 (N.D.Ga.1993) ("These objectors significantly refined the issues germane to a consideration of the fairness of this complex settlement and their participation transformed the settlement hearing into a truly adversarial proceeding."); *Howes v. Atkins,* 668 F.Supp. 1021, 1027 (E.D.Ky.1987) (awarding fees to objector's counsel because their efforts assisted the court; "[o]bjector's counsel ably performed the role of devil's advocate").

## B. Benefits Conferred by Objector

 In the present case, I conclude that the objector contributed materially to the proceeding both by benefitting a given group of litigants and the class as a whole, and also by assisting the court and enhancing the adversarial process. First, the objector conferred a benefit on the approximately 970 Plan participants who invested in the Fund, both by negotiating a revised release so as to preserve their ERISA claims and by helping to insure that they may participate in the settlement. Further, he conferred a benefit on the class as a whole by convincing the settling parties to modify the release to take into consideration the interests of the Plan participants. By doing this, the objector made the settlement fairer and, therefore, less vulnerable to legal challenge either on appeal or via collateral attack. A successful challenge to the settlement would have harmed the class by impeding the distribution of benefits and requiring additional expenditures. Finally, the objector aided the court and enhanced the adversarial process by generating debate about issues relating to the proposed settlement which otherwise would not have been discussed.

Plaintiffs dispute that the objector contributed to the proceeding. First, they argue that the objector did not confer a benefit on the class because, even though he may have helped the Plan participants, the Plan participants are not class members. During the settlement proceedings, the settling parties hotly debated the question of objector's and the other Plan participants' class membership. Plaintiffs contended that the Plan was a class member, not the participants, because it purchased Harnischfeger stock during the class period, whereas the participants only purchased units in the Fund. Defendants disagreed and, relying on *Kurzweil v. Philip Morris Cos.,* No.94–CV–2373, 2001 WL 25700 (S.D.N.Y. Jan.10, 2001), argued that investors in the Fund should be regarded as purchasers of Harnischfeger stock and thus members of any class that included such purchasers.[2]

**2.** The settling parties' arguments concerning the objector's class membership have not always been consistent. At the fairness hearing, plaintiffs, who now argue that the objector is not a class member, admonished him for filing the ERISA suit and thereby violating the Preliminary Order barring class members from commencing an action asserting any of the settled claims.

Because the parties modified the settlement to address the objector's concerns, I need not decide whether the Plan participants are class members. For present purposes, however, it is sufficient to say that they have a substantial stake in the settlement. This is so both because they are the beneficial owners of stock purchased by the Plan during the class period and thus may be entitled to proceeds from the settlement, and because the settlement could have extinguished their ERISA claims. As a practical matter, the participants, not the Plan, stood to gain or lose from the settlement. Therefore, the fact that the objector conferred benefits on the Plan participants is a sufficient basis for awarding attorneys' fees.

Plaintiffs also dispute that the objector's efforts made it more likely that the participants would share in the settlement. They argue that the Plan, which in their view is a class member, could have adequately represented the participants' interests during the settlement proceeding. However, there was strong reason to believe that this was not so. With respect to the issue of preserving the participants' ERISA claims, the interest of the Plan fiduciaries was in direct conflict with that of the participants. The participants had an interest in preserving their ERISA claims but the Plan fiduciaries were defendants in the Boston lawsuit and would have benefitted if such claims were extinguished. Significantly, the Plan fiduciaries did not come forward and object to the proposed settlement's broad release which would have extinguished the ERISA claims. Further, the Plan fiduciaries failed to notify the participants of the proposed settlement. Under ERISA, the Plan fiduciaries had a duty to act solely in the interests of Plan participants and beneficiaries. 29 U.S.C. §§ 1101–1114. The failure of the Plan fiduciaries to aggressively protect the interests of the Plan participants during the settlement proceeding suggests that the fiduciaries were unable or unwilling to comply with their duties under ERISA. Thus, plaintiffs' argument that the objector's efforts were unnecessary because the Plan could have represented the participants' interests is unpersuasive.

Moreover, the objector successfully opposed the suggestion of the settling parties that the Plan participants could preserve their ERISA claims by giving up their rights to participate in the settlement. The objector responded to this suggestion by arguing that it would be unfair to require the participants to choose between their rights under the securities laws and under ERISA. By making this argument he helped to ensure that the participants would be eligible to participate in the settlement.

Plaintiffs also argue that the objector did not preserve the participants' ERISA claims because it is uncertain whether the language of the original release would have extinguished them. However, this argument directly contradicts statements made previously both by plaintiffs and defendants. At the fairness hearing, plaintiffs advised that if the proposed settlement was approved, most of the ERISA claims would probably be released. And defendants stated that the broad language in the proposed settlement was put there deliberately and was designed to put all matters relating to Harnischfeger stock losses, including the participants' ERISA claims, to rest. Moreover, the language of the original release was extremely broad, and the objector's concerns about its potential impact on the Boston lawsuit were warranted. Thus, the objector is justified in asserting that he preserved the Plan participants' ERISA claims.

Plaintiffs also argue that even if the objector conferred a benefit on the Plan participants, he should not be awarded attorneys' fees because the benefit did not extend to the entire class. However, the Plan participants constituted a large group of litigants numbering almost 1,000 Harnischfeger employees. Although it is presently unclear how many stock purchasers will claim a share of the settlement, by any measure, the Plan participants represent a substantial percentage of potential claimants and a group large enough on which to base a fee award.

Moreover, the objector did, in fact, confer a benefit on the entire class. By asking for

And defendants, who now argue that the objector is a class member, argued that objector had not satisfied his burden of proving class membership and that, therefore, he had no standing to object.

and obtaining a modified release, he made the settlement less vulnerable to legal challenge. In doing so, he benefitted the class as a whole because a successful challenge to the settlement would have impeded the distribution of funds to class members and required additional expenditures. If I had embraced the arguments of the settling parties and approved the proposed settlement without addressing the objector's concerns, I believe that the settlement might well have been set aside on appeal or pursuant to collateral attack on the ground that it was unfair. A settlement of a securities class action bought by purchasers of stock that extinguished the ERISA claims of company employees, even though such claims had never been asserted in the class action and were not compensated in the settlement, could reasonably have been regarded as failing to satisfy the requirement that it be fair, adequate and reasonable.

The protracted debate between the settling parties and the objector only increased my doubts about the fairness of the proposed settlement. Neither of the settling parties ever directly addressed the fairness issue but rather focused their arguments on narrower questions such as whether the participants were or were not class members and what consequences might flow from the answer to that question. However, the debate about class membership demonstrated that the issue of fairness was inescapable. As previously indicated, if plaintiffs were right and the Plan was a class member, this conclusion would have presented serious questions as to whether the Plan could or would protect the participants' interests as ERISA required it to do. The Plan fiduciaries made no attempt to preserve the participants' ERISA claims and, in fact, would have benefitted from the extinguishment of such claims. Further, they failed to notify the participants of the proposed settlement. In addition, class counsel urged me to ignore the interests of the Plan participants because they were not class members. Had I embraced plaintiffs' argument, the Plan participants would have had no voice at all in the settlement proceeding, despite having a substantial stake in the settlement. Under such circumstances how could I have reasonably approved the settlement as being fair?

Nor would the fairness issue have gone away if I had adopted defendants' position that the Plan participants were class members. For if the participants were class members, other issues relating to fairness would have immediately arisen. First, under Fed.R.Civ.P. 23(c)(2), class actions maintained under Rule 23(b)(3) require "individual notice to all members who can be identified through reasonable efforts," yet none of the participants had received notice of the proposed settlement. Second, neither the named plaintiffs nor class counsel was adequately representing the Plan participants as required by Rule 23(a)(4). The principal interest of the Plan participants was to preserve their ERISA claims, and class counsel was arguing in favor of a proposed settlement which extinguished such claims. If I had determined that the participants were class members I would probably have had to decertify the class or to create a subclass. I surely could not have approved the settlement as being fair, adequate and reasonable.

Thus, no matter from which perspective it was viewed, the settlement, as initially proposed, would have been vulnerable to a challenge based on unfairness. Had the challenge succeeded and the settlement been overturned, it obviously would have been detrimental to the class. Thus, by assisting in the resolution of the fairness issue, the objector benefitted the entire class.

Finally, as the foregoing discussion indicates, the objector contributed materially to the proceeding by sharpening the debate, enhancing the adversarial process and aiding the court. He raised a number of issues that otherwise would have gone unnoticed, including: (1) the fairness of the proposed settlement insofar as it concerned Plan participants; (2) the question of the participants' class membership and its relevance to the fairness question; (3) whether the Plan participants had received adequate notice of the proposed settlement; (4) whether the Plan participants were being adequately represented in the action by the Plan fiduciaries, by the named plaintiffs and by class counsel; and (5) what, if any, action I should take with respect to any of the foregoing issues. The

objector demonstrated that the case was more complicated than it initially appeared and, in doing so, made a significant contribution.

Therefore, by conferring a benefit on the Plan participants and on the class as a whole, and by aiding the court, the objector is entitled to an award of attorneys' fees.

## C. Determination of Appropriate Award

Following the Seventh Circuit's approach, I will attempt to award a fee comparable to what an attorney would receive from a paying client in a similar case. *See Cook,* 142 F.3d at 1012. However, determining what an objector's attorney would receive from a paying client in a comparable case is more difficult than determining what class counsel would receive. This is so for several reasons. First, there is less data. *See, e.g.,* Susan P. Koniak & George M. Cohen, *In Hell There Will Be Lawyers Without Clients or Law,* 30 Hofstra L.Rev. 129, 154 n. 150 (2001) (quoting Thomas E. Willging, et al, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 68 n. 142 (1996)) (finding " 'no fee awards to, and few fee requests by, counsel other than plaintiffs' counsel' "). Second, I have found no case involving an objection comparable to the one in the present case. Most objections are to class counsels' request for attorneys' fees. *Id.* Third, at least one of the factors which is appropriately considered in determining whether to award attorneys' fees to an objector—whether the objector enhanced the adversarial process—has no readily apparent marketplace analogue.

The problem of determining an appropriate award is particularly difficult in the present case because the value of the benefits conferred by the objector are unknown. The value of the Plan participants' ERISA claims will be determined in the lawsuit in Boston, and the value of their interest in the settlement may be determined as claims are administered. Further, attaching a value to the fact that the settlement is probably less vulnerable to challenge involves an element of speculation.

To try to make the determination somewhat less subjective, I will compare the relative value of the objector's counsel's contribution to that of class counsel. The objector seeks a fee award of roughly ten percent of the amount requested by class counsel plus out-of-pocket expenses. In support of his request, he points both to his contributions to the proceeding and to his counsel's having spent 1,643.10 hours on the case. As I have indicated, the objector's contribution was significant. Nevertheless, a fee of ten percent of class counsel's is excessive.

Class counsel obtained a recovery of more than ten million dollars. It is uncertain whether objector's counsel's efforts will yield a monetary gain for the Plan participants, and if so, in what amount. The value of the ERISA claims being litigated in Boston has not been established. Further, if the Plan participants prevail in their ERISA suit they will likely be awarded attorneys' fees.

Weighing in favor of the objector, however, is the fact that much of his counsel's work was necessitated by the unyielding response of the settling parties to his relatively modest request to modify the proposed release to exclude the ERISA claims. Had the settling parties acknowledged earlier that the relief the objector requested was reasonable and possibly even required by due process, he would be seeking less in attorneys' fees. Instead, the settling parties fought the objector unremittingly.

Thus, I conclude that the objector is entitled to an award of attorneys' fees equal to five percent of the amount requested by class counsel plus his reasonable expenses. Therefore, I will award him $152,250.00 in attorneys' fees and grant his request for $13,530.87 in expenses.

The question of who shall pay these fees and costs remains to be addressed. Although I am authorized to award fees from the common fund, I must take great care in doing so. *See Skelton v. Gen. Motors Corp.,* 860 F.2d 250, 253 (7th Cir.1988) (stating in a common fund case, "[t]he court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications"). My responsibility is even greater

where, as here, the common fund results from a pre-certification settlement. *Bowling v. Pfizer, Inc.*, 922 F.Supp. 1261, 1278 (S.D.Ohio), *amended by*, 927 F.Supp. 1036 (S.D.Ohio), *aff'd*, 102 F.3d 777 (6th Cir.1996), *cert. denied*, 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997). In the present case, I am not inclined to impose the burden of paying the objector's attorneys' fees on the class. While the overall settlement is reasonable, there are likely to be many claimants, and the amount available to each will probably be modest.

It is not entirely clear whether I may order defendants to pay a portion of the objector's attorneys' fees. Defendants argue that I may not. Generally, courts may not substitute their preferences as to proper settlement terms for those of the litigants. *Armstrong*, 616 F.2d at 315. Also, the language of the settlement provides that, "defendants shall not be required to pay ... more than the amounts set forth in this paragraph." (Stip. of Settlement ¶ 6(c).) While I may lack the authority to order defendants to share the burden of paying the objector's fees with class counsel, I believe that it would be fair for them to do so. Defendants opposed the objector's request to modify the release as vehemently as plaintiffs. Thus, I will enter an order similar to that in *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 942, 974 (E.D.Tex.2000), a case cited both by the objector and defendants, namely that the attorneys' fees awarded to the objector are to be paid by class counsel and the defendants as they may agree but without diminution of the sum awarded to the class.

## VI. CONCLUSION

For the reasons stated, I will reaffirm my previous order certifying the class and will further enter an order approving the settlement with the modification agreed to by the objector and the settling parties. I will award $3,045,000.00 in attorneys' fees to class counsel and $332,425.94 for reimbursement of expenses. Interest will be awarded thereon at the same rate as earned by the settlement fund since the date of deposit. Plaintiffs C. William Carter and Great Neck Capital Appreciation Investment Partnership L.P. will each be awarded $5,000.00. Objector will be awarded attorneys' fees of $152,250.00 and reimbursement for out-of-pocket expenses of $13,530.87. This award shall be divided among objector's various counsel as they may agree. The award of fees and costs to the objector shall be paid by class counsel and defendants as they may agree but without diminishing the sum awarded to the class.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that my order of October 19, 2001, certifying the class is affirmed.

**IT IS FURTHER ORDERED** that the settlement of the parties is approved with the modification agreed to by the objector and the settling parties.

**IT IS FURTHER ORDERED** that class counsel is awarded $3,045,000.00 in attorneys' fees and $332,425.94 for reimbursement of expenses. Interest is awarded thereon at the same rate as earned by the settlement fund since the date of deposit.

**IT IS FURTHER ORDERED** that plaintiffs C. William Carter and Great Neck Capital Appreciation Investment Partnership L.P. are each awarded $5,000.00.

**IT IS FURTHER ORDERED** that objector is awarded attorneys' fees of $152,250.00 and reimbursement for out-of-pocket expenses of $13,530.87.

**IT IS FURTHER ORDERED** that the award of attorneys' fees and costs to the objector shall be paid by class counsel and defendants as they may agree but without diminishing the sum awarded to the class.